**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Apr 17 2013, 10:18 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**R. PATRICK MAGRATH**
Alcorn Goering & Sage. LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE:

**AMANDA TEBBIE CANESSA**
DCS, Dearborn County
Lawrenceburg, Indiana

**ROBERT J. HENKE**
DCS, Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) | |
| T.P. (Minor Child), | ) ) | |
| and, | ) ) | |
| D.P. (Father), | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 15A01-1207-JT-320 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

**April 17, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

D.P. ("Father") appeals the termination of his parental rights to his son, T.P. We affirm.

## Issue

The sole issue before us is whether there is sufficient evidence to support the termination of Father's parental rights.

## Facts

Father and E.M.-P. ("Mother") are the parents of T.P., who was born in June 2007. In July of 2010, T.P. was removed from Mother's care and a child in need of services ("CHINS") proceeding was initiated after Mother's parents were arrested for drug dealing at Mother's house and in the presence of the children.[1]  Mother also faced charges from this incident. Mother denied any involvement in drug dealing or drug usage, but a drug screen revealed the presence of heroin and morphine in her system.

---

[1] There also is reference in the record to T.P. having previously been removed from his parents' care in 2008. However, none of the facts or circumstances regarding that removal are in the record.

T.P. was not placed with Father at this time because he was in jail awaiting trial on a charge of Class B felony dealing in a controlled substance. On February 4, 2011, Father pled guilty to this charge and was sentenced to a term of twenty years, with twelve years suspended and eight executed. Father also has two 2008 convictions for Class D felony nonsupport of a dependent child for children other than T.P. Father violated his probation for these convictions on four occasions.

After removal from Mother, T.P. was placed in foster care with his half-brother A.T. and half-sister T.M. The foster parents later requested T.M.'s removal from their home due to her emotional difficulties and aggressive behavior towards her half-siblings and the foster parents' biological daughter. The foster parents have expressed a desire to adopt T.P. and A.T., but not T.M. The Department of Child Services ("DCS"), however, wants to attempt to reunify T.P. and A.T. with T.M. and have all three adopted together, a plan with which the foster parents disagree.

On February 23, 2012, DCS filed a petition to terminate Father's parental rights to T.P.; Mother consented to termination of her parental rights. At the termination hearing held on June 18, 2012, there was evidence presented that Father's earliest possible release date as of that time was June 25, 2014. Father testified that he was participating in a substance abuse program that, if completed, could move his release date to February 2014, and he was also planning to participate in vocational training that could further push his release date back to August 2013. Father also testified that he did not have definite employment or housing plans for when he was released from prison, admitting

3

that he would "have to establish myself before I can do anything." Tr. p. 49. He also stated that he had a couple of options of where he might live when he is released, "but I don't want . . . I'm not going to try to bring my son to something like that . . . ." Id. at 52. A DCS caseworker and a guardian ad litem ("GAL") both testified that termination of Father's parental rights was appropriate because of T.P.'s need for permanency. The DCS caseworker also testified that she was confident T.P. could be adopted, an assessment with which the foster mother agreed.

On July 2, 2012, the trial court entered an order terminating Father's parental rights.[2] Father now appeals.

**Analysis**

"When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility." In re I.A., 934 N.E.2d 1127, 1132 (Ind. 2010). We consider only the evidence and reasonable inferences most favorable to the judgment. Id. "We must also give 'due regard' to the trial court's unique opportunity to judge the credibility of the witnesses." Id. (quoting Indiana Trial Rule 52(A)). Where a trial court enters findings of fact and conclusions thereon, as the trial court did here, we apply a two-tiered standard of review. Id. "First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." Id. We will set aside the trial court's judgment only if it is clearly erroneous, which occurs if

---

[2] The DCS also sought to terminate the parental rights of A.T.'s father. The trial court terminated the parental rights of A.T.'s father in the same order as the one terminating Father's parental rights to T.P. A.T.'s father does not appeal.

4

the findings do not support the trial court's conclusions or the conclusions do not support the judgment. Id.

A petition to terminate a parent-child relationship must allege:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

5

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS has the burden of proving these allegations by clear and convincing evidence. I.A., 934 N.E.2d at 1133.

Father first challenges the trial court's finding that there was a reasonable probability the reasons for T.P.'s placement outside the home would not be remedied. The trial court noted Father's incarceration at the time of removal and for some time in the future after the termination hearing, and also that he had been unable to provide necessities for T.P. in the past and had no adequate plan for doing so in the future. When deciding whether there is a reasonable probability that the conditions leading to a child's removal will not be remedied, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. Additionally, a court may consider not only the basis for a child's initial removal from the parent's care, but also any reasons for a child's continued placement away from the parent. In re A.I., 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), trans. denied. The court may also consider the parent's habitual patterns of conduct, as well as evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. McBride v. Monroe County Office of Family and Children, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). "Finally, we must be ever mindful that parental rights, while constitutionally protected,

6

are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination." Id.

Father contends that this case is directly parallel to In re G.Y., 904 N.E.2d 1257 (Ind. 2009), and In re J.M., 908 N.E.2d 191 (Ind. 2009), in which our supreme court held that the termination of parental rights of incarcerated parents was improper. In G.Y., a mother was sent to prison when her child was twenty months old for an offense—Class B felony dealing in cocaine—committed before the child was conceived. The mother had committed no crimes after the child was born. While incarcerated, the mother had regular visitation with the child and she completed a drug treatment program and a parenting class. She had made arrangements for employment and suitable housing upon release from prison, which was to occur as early as sixteen months after the termination hearing. The child was in foster care placement and doing well in that placement and there was no evidence that continued placement in that setting while mother completed her prison term would be detrimental. Based upon this evidence, our supreme court reversed an order terminating the mother's parental rights. G.Y., 904 N.E.2d at 1265-66.

In J.M., the DCS sought to terminate the parental rights of both the mother and father of a child after both were incarcerated on methamphetamine dealing-related charges. This was the second set of such charges that the parents had incurred after the child was born. The trial court refused to terminate the parents' parental rights, after receiving testimony that they both could be released early from prison for completing certain degrees, or as soon as approximately six months to a year after the termination

7

hearing, that both parents had completed a number of self-improvement programs while incarcerated, and that the father had secured employment and housing upon his release from prison. Under these circumstances, our supreme court agreed with the trial court's refusal to terminate because the parents' ability to establish a proper household for the child could be determined within a relatively short period of time and the child's need for permanency would not be unduly threatened. J.M., 908 N.E.2d at 196.

We do not believe G.Y. and J.M. compel reversal here. We first note that in J.M., our supreme court made a point of stating that the rulings in that case and G.Y. so close in time was "coincidence and not a reflection of any presumption as to the outcome" of cases involving the termination of parental rights of incarcerated parents. Id. at 192. It also noted that it had regularly denied transfer in cases from this court in which we affirmed the termination of parental rights of incarcerated parents. Id. at 192 n.1. We further observe that in J.M., our supreme court was reviewing the denial of a petition to terminate parental rights; thus, the court was compelled to view the evidence and the trial court's findings in a light most favorable to that denial. See id. at 194 (citing Bester v. Lake County Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005)). Here, by contrast, we must view the evidence and findings in a light most favorable to the termination of Father's parental rights. Thus, J.M. is of limited assistance in reviewing this case.

Here, the primary similarity between this case and G.Y. and J.M. is the remaining time that Father expects to be in prison. However, in specific contrast to J.M., in which

8

the trial court tended to accept the parents' representations that they could obtain release before their official release dates, which was confirmed by evidence presented during appeal and oral argument before our supreme court, the trial court here did not expressly, and was not required, to accept Father's assertion that he could be released as early as August 2013 based on the completion of a class that he had not yet begun at the time of the termination hearing. At the time of that hearing, Father's expected release date was still June 25, 2014, or two years after the hearing.

Moreover, not only was Father convicted of three offenses after T.P. was born, he violated probation on four occasions with respect to the first two convictions. Father notes that the first two convictions for nonsupport of a dependent did not involve T.P. and were for conduct alleged to have occurred in May 2007, before T.P. was born. However, as the trial court found and we agree, it is especially troubling that Father has such convictions on his record, as they directly reflect upon his ability to care for his children. The violations of probation likewise occurred after T.P. was born. It also can reasonably be inferred, based on his subsequent conviction for dealing in a controlled substance after T.P. was born, that he still had not obtained the necessary legal income to care for himself and his children. The extent and type of criminal behavior in Father's case is more egregious than that in G.Y. and J.M.

Additionally, unlike in G.Y. and J.M., Father has no set plans for establishing an independent household for him and T.P. after he is released from prison. He has no promise of legal employment or of adequate housing. He testified as to needing a period

9

of time to establish himself after release, but that time period is indefinite. Thus, unlike in G.Y. and J.M., this is not a case in which the adequacy of Father's parenting could be evaluated within a relatively short period of time after his release. Also, unlike in G.Y., Father did not have regular visitation with T.P. during his incarceration. Although Father claimed at the termination hearing to have attempted to make contact with DCS caseworkers, the DCS caseworker who testified at the hearing and who had worked on T.P.'s case for approximately a year had never received any communication from Father. In sum, we conclude this case is distinguishable from G.Y. and J.M., and that the trial court did not clearly err in finding there was a reasonable probability that the conditions leading to T.P.'s placement outside the home—Father's incarceration and inability to adequately care for T.P.—would not be remedied in the foreseeable future.

Father also claims there is insufficient evidence that termination of his parental rights is in T.P.'s best interests. "A determination of the best interests of the children should be based on the totality of the circumstances." In re A.P., 981 N.E.2d 75, 82 (Ind. Ct. App. 2012). The trial court must subordinate the interests of the parent to those of the children involved when making a best interests determination. Id. A finding that termination is in the best interests of the children may be supported by evidence of a parent's historical inability to provide a suitable environment along with the parent's current inability to do the same. Id.

Here, we have already outlined Father's historical inability to provide a suitable environment for T.P. and his current and future inability to do so. Also, both the DCS

10

caseworker and the GAL testified as to their beliefs that termination was in T.P.'s best interests, especially with respect to permanency for T.P.'s home life. We should not lightly disregard or second-guess such opinions. See id. at 84-85. The GAL additionally testified as to T.P. personally expressing concerns about wanting to have a permanent home. The evidence is sufficient to establish that the termination of Father's parental rights is in T.P.'s best interests.

Finally, Father asserts that DCS failed to prove it had a satisfactory plan for T.P. following termination. Generally, DCS's attempting to find suitable parents to adopt a child meets the "satisfactory plan" element of a termination petition, even if there is not a specific family in place to adopt the child. Lang v. Starke County Office of Family & Children, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007), trans. denied. Here, DCS planned to place T.P. for adoption. Both the DCS caseworker and the current foster mother expressed confidence that T.P. is a good candidate for adoption.

Nonetheless, Father contends we should find DCS's plan for T.P. to be inadequate because of the dispute between DCS and the current foster mother regarding whether an attempt should be made to reunite T.P. with his half-sister T.M. before placing him for adoption and that he be adopted along with her (and A.T.) rather than separately. The current foster parents do appear adamant that DCS should not attempt such reunification. However, this difference of opinion between DCS and the foster parents as to T.P.'s future care and placement has little bearing on the relationship between Father and T.P. and whether Father's parental rights should be terminated. In other words, DCS has

11

enunciated a satisfactory plan for T.P.'s future care and the trial court was not required to believe that the current foster parents are clearly correct in their contention that DCS should alter that plan. Additionally, the current foster mother testified that T.P. was a good candidate for adoption, with or without T.M. As such, we cannot say the trial court clearly erred in finding that DCS has a satisfactory plan for T.P.'s future care.

## Conclusion

There is sufficient evidence to support the termination of Father's parental rights. We affirm.

Affirmed.

BAKER, J., and RILEY, J., concur.