# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**PAUL JUNGERS**
Terre Haute, Indiana

**DEBORAH K. SHEPLER**
Sullivan, Indiana

ATTORNEYS FOR APPELLEE:

**RITA PAULETTE STAGG**
Sullivan, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**FILED**
Nov 15 2012, 9:14 am

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF | ) | |
| THE PARENT-CHILD RELATIONSHIP OF: | ) | |
| A.P. & Au.P. (Minor Children) | ) | |
| | ) | |
| M.H. & T.P. (Mother & Father), | ) | |
| | ) | |
|       Appellants-Respondents, | ) | |
| | ) | |
|       vs. | ) | No. 77A01-1202-JT-59 |
| | ) | |
| THE INDIANA DEPARTMENT OF CHILD | ) | |
| SERVICES, | ) | |
| | ) | |
|     Appellee-Petitioner. | ) | |

APPEAL FROM THE SULLIVAN SUPERIOR COURT
The Honorable Robert E. Springer, Judge
Cause No. 77D01-1105-JT-25
Cause No. 77D01-1105-JT-26

**November 15, 2012**

**OPINION – FOR PUBLICATION**

**PYLE, Judge**

M.H. ("Mother") and T.P. ("Father") appeal the termination of their parental rights as to their minor children, A.P. and Au.P. (collectively, "the children").

We affirm.

ISSUES

1. Whether the trial court erred in concluding that there was clear and convincing evidence to support the termination of Mother's parental rights.

2. Whether the trial court erred in concluding that there was clear and convincing evidence to support the termination of Father's parental rights.

FACTS

A.P. was born on July 11, 2007, and Au.P. was born on November 19, 2008. Mother and Father were not married at the time either child was born; however, Father's paternity was established for both children. Mother and Father's relationship was sporadic, with Father frequently living apart from Mother and the children. Indeed, during most of the CHINS proceeding, Father did not live with Mother.

In 2007, while pregnant with A.P., Mother used methamphetamine. A.P. was found to be a child in need of services ("CHINS") when he tested positive for methamphetamine. The case was closed on February 26, 2009, after Mother complied with services.

In 2010, Mother, who was then living in Sullivan County but on probation in Knox County, again tested positive for methamphetamine. Knox County officials informed the Sullivan County Department of Child Services ("SDCS") of the positive

test, and SDCS investigated on February 1, 2010. Mother admitted to using methamphetamine, and SDCS determined that she was unable to adequately supervise the children. SDCS removed the children from Mother's care, filed a CHINS petition, and placed the children in the care and custody of M.G, the children's maternal grandmother, and J.G., the children's step-grandfather ("the children's grandparents"). At the time, SDCS could not locate Father.

In a predispositional report filed with the trial court on February 19, 2010, SDCS stated that the children were living in the home with Mother and the children's grandparents. The children's grandparents were designated "the relative placements." (Petitioner's Ex. 4). The report stated that Mother and Father would initially participate in supervised visitation with the children, with a goal of participating in unsupervised visitation.

The trial court adjudicated the children as CHINS as to both Mother and Father. On March 3, 2010, the court ordered Mother to (1) become and remain drug free; (2) complete intensive outpatient program ("IOP") classes with Reverend Carl Beadle; (3) comply with random drug screens; (4) sign all necessary releases; and (5) participate in individual and/or family therapy. The court ordered Father to contact SDCS. The court also ordered both parents to (1) cooperate with all SDCS requests; (2) notify SDCS prior to address, employment, or household changes; and (3) "participate in visitation schedule set by [SDCS], starting out with supervised and moving to unsupervised as he/she participates in services." (Mother's App. 58). The order further stated that the children were to remain in their current home or placement "with supervision by [SDCS]" and that

3

SDCS was awarded wardship of the children, "with responsibility for supervision, care and placement." (Mother's App. 58-59). On the same date, but in a separate order, the trial court ordered Mother to pay $25.00 per week in child support.

Under the SDCS permanency plan for reunification, Mother was required to participate in therapy at her home with Chris Parr ("Parr") of Lifeline Youth and Family Services. Mother participated in approximately thirty-eight therapy sessions with Parr during a period beginning in April 2010 and ending April 2011. Parr concluded that although Mother gained limited insight into her drug problem, her "behaviors suggested that she would use." (Tr. 101). Parr noted that Mother failed drug screens from the beginning to the end date of the services provided by Lifeline.

During the course of the CHINS case, Mother completed fifty-three drug screens. Of these screens, only four were clean. Mother tested positive six times for methamphetamine and one time for THC. She tested positive numerous times for prescription-type substances, including for hydrocodone, oxycodone, and oxymorphone. Mother failed to participate in seventeen screens, which were considered to be positive. Mother took prescription medication during this time period, but she consistently failed to list that information on her consent forms. She also exhibited a wide variety of drug levels, and on one occasion, Parr caught her snorting crushed prescription medicine. After testing positive for methamphetamine, Mother was found to be in contempt of the trial court's order in August of 2010 and February of 2011. Mother argued that one of the tests was a false positive because she was using bath salts, not methamphetamine, to obtain a high.

4

Mother requested and was granted permission to transfer from a drug program at the Sullivan Hamilton Center to a similar, but shorter program at the Terre Haute Hamilton Center. However, she refused to sign a release to allow the Terre Haute program's physician to consult with Mother's other physicians about her prescription drug use. The Terre Haute Hamilton Center declined to treat Mother because, without the release, its physician could not determine whether Mother was "med seeking." (Tr. 18).

Mother completed Reverend Beadle's twelve-step program during the summer of 2011; however, she had previously completed the same program and continued to use methamphetamine. Mother went to the Luke House, a sober living environment, but by the time of the termination hearing, she had been asked to leave when she informed a Luke House employee that she would fail a drug screen. Mother also had one positive drug screen for opiates while at Luke House.

Mother was incarcerated three times during the CHINS case for habitual driving violations, and two of the sentences were served concurrently with contempt sentences for continued drug use during the CHINS case. Mother was convicted as a habitual violator of traffic laws for continuing to drive with a suspended license, which led to forfeiture of her driving privileges for life. She was subsequently convicted of operating a motor vehicle while privileges are forfeited for life, a class C felony. Mother's lack of an operator's license resulted in numerous problems related to services provided through SDCS; however, she did not ask SDCS for help with transportation.

Father participated in home-based counseling on approximately two occasions. He failed to stay in contact with SDCS, service providers, and the guardian ad litem, Jennifer Hawkins. Before the termination hearings, Father failed to attend many of the CHINS-related hearings. He voluntarily appeared in court on one occasion, and he appeared on other occasions while in custody of police officers. A contempt action was initiated against Father after he failed to visit with the children in the manner ordered by the trial court. After Father indicated that he was not interested in SDCS services or assistance and failed to participate in offered services, SDCS focused its full attention on Mother.

On May 4, 2011, the trial court conducted a permanency hearing, and SDCS filed a verified petition for termination of Mother's and Father's parental rights. On June 5, 2011, SDCS changed the permanency plan from reunification to termination of parental rights and adoption, a change that the trial court approved on July 6, 2011.

On October 21, December 21, and December 28, 2011, the trial court held evidentiary hearings on the termination petition. On January 18, 2012, the trial court terminated both parents' rights.

Additional facts are discussed below as necessary.

### DECISION

The traditional right of parents to establish a home and raise their child is protected by the Fourteenth Amendment to the United States Constitution. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Parental rights may be terminated when parents are unable or unwilling to meet their parental

6

responsibilities. *Id.* The purpose of terminating parental rights is not to punish a parent but to protect the child. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied.*

When DCS seeks to terminate parental rights pursuant to Indiana Code § 31-35-2-4(b)(2), it must plead and prove in relevant part:

> (A) that one (1) of the following is true:
>
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> >
> > * * * *
>
> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied;
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child;
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services.
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

These allegations must be established by clear and convincing evidence. *In re I.A.*, 934 N.E.2d 1127, 1133 (Ind. 2010).

1. Termination of Mother's Rights

    a. *Threat to Well-Being of Children*

7

Mother contends that the trial court's findings are insufficient to support its conclusion that continuation of her parental relationship with A.P. and Au.P. poses a threat to the well-being of the children. When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Bester*, 839 N.E.2d at 147. We will only consider the evidence and reasonable inferences therefrom that are most favorable to the judgment. *Id.* When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. *Id.* First, we determine whether the evidence supports the findings. *Id.* Then, we determine whether the findings support the judgment. *Id.* The trial court's judgment will be set aside only if it is clearly erroneous. *Id.* "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *Id.* (quoting *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005)).[1]

In determining whether the continuation of a parent-child relationship poses a threat to the children, a trial court should consider a parent's habitual pattern of conduct

---

[1] SDCS argues that Mother has failed to address the issue of whether there is sufficient evidence to support the trial court's finding that Mother poses a threat to the well-being of the children under Indiana Code § 31-35-2-4(b)(2)(B)(ii). Thus, SDCS maintains that Mother has waived the issue. We note, however, that Mother specifically references the trial court's conclusion in her statement of the issues portion of her brief and in the corresponding argument heading. Although Mother's argument mixes the issue with that of the best interests of the children, we cannot say that waiver is warranted.

Because subsection (b)(2)(B) is written in the disjunctive, SDCS need prove only one of the elements by clear and convincing evidence. *See I.A.*, 934 N.E.2d at 1133. Thus, if we hold that the evidence sufficiently shows that there is reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child, we need not address whether conditions resulting in removal or the reasons for placement outside the home of the parents will not be remedied or whether the children, on two separate occasions, have been adjudicated children in need of services. *See* I.C. § 31-35-2-4(b)(2)(B).

to determine whether there is a substantial probability of future neglect or deprivation. *Bester*, 839 N.E.2d at 152. At the same time, however, a trial court should judge a parent's fitness to care for her child as of the time of the termination proceedings, taking into consideration evidence of changed conditions. *Id*.

Here, Mother tested positive for methamphetamine on three occasions in the summer of 2010; missed three drug screens in July of 2010; and tested positive on two occasions for methamphetamine in February of 2011. Indeed, Mother submitted to fifty-three drug screens in a period ranging from February 1, 2010, to March 28, 2011. Of these screens, six were positive for methamphetamine, one was positive for THC, and forty-nine were positive for prescription controlled substances.[2]

The court inferred from the fluctuation in levels of the prescription drugs that Mother was abusing the drugs. This inference is bolstered by Parr's observation that Mother snorted prescription drugs through a straw.

The trial court found that Parr was not convinced that Mother "was successful with his services." (Mother's App. 16). Mother had made no changes in other aspects of her life, including the chaos in her home life that temporarily convinced her on more than one occasion that she should voluntarily terminate her parental rights. In addition, as the trial court found, Mother "would verbalize her problems, [but] she did not act upon correcting them and continued to blame those around her for her difficulties." *Id*. Mother's failure to take responsibility for her problems extended to the permanent suspension of her driver's license and to her inability to admit that her disregard for the

---

[2] Some screens showed levels of multiple drugs.

9

law resulted in "serious felony charges and further incarceration." *Id.* In addition, Mother blamed SDCS for her continued drug use.

Mother emphasizes that she sought out Reverend Beadle's twelve-step program while incarcerated and took a parenting program while incarcerated. The trial court is not required to believe or assess the same weight to evidence as Mother. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004). Certainly, the trial court could have concluded that Mother's successes while in a regimented setting would not be duplicated in a world where she had no job, no transportation, free access to drugs, and much chaos.

Even with the permanent presence of the children's grandparents in Mother's home, Mother could not avoid drugs that impaired her ability to parent and put her children at risk. We cannot say that the trial court abused its discretion in concluding that Mother posed a threat to the well-being of the children.

### b. Best Interests

Mother contends that the termination of the parent-child relationship was not in the children's best interests. She argues that she has a loving bond with the children. She also points to the evidence discussed in our analysis of the previous issue, such as the programs she attended while incarcerated.

A determination of the best interests of the children should be based on the totality of the circumstances. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007), *trans. denied.* In making this determination, the trial court must subordinate the interests of the parent to those of the children involved. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to

10

provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children." *Lang*, 861 N.E.2d at 373.

Here, the trial court found that the guardian ad litem reported that Mother "has no proven record of sobriety or accepting responsibility for her actions. Consequently, and without a drastic change in attitude, actions and lifestyle . . . it is in the children's best interest for [Mother's] parental rights to be terminated." (Mother's App. 27). The trial court also found that it is in the children's best interests to terminate Mother's parental rights because of Mother's (1) continued drug use over a period of four years, beginning with the prior CHINS proceeding; (2) "failure to complete and, indeed, barely begin, drug treatment"; (3) "lack of progress with home-based counseling"; and (4) failure to pay ordered child support to the children's grandparents. *Id.*

Nathan Noel, the SDCS family case manager, testified that Mother's past behavior has proven to be the best predictor of her future behavior. Thus, he concluded that it was in the best interests of the children to terminate Mother's parental rights. The guardian ad litem testified that termination was warranted "short of a change in attitude and a change in responsibility . . . ." (Tr. 129).

Mother's strong bond with the children does not eradicate the effects that her continued behavior has and will have upon them. Based upon the family case manager's and the guardian ad litem's testimonies, and upon the totality of circumstances as documented by the trial court and described in our analysis of the previous issue, we

11

cannot conclude that the trial court erred in determining that termination is in the children's best interests.

2.      Termination of Father's Rights

    a.      *Threat to Well-Being of the Children*

Father contends that the trial court's findings are insufficient to support its conclusion that continuation of his parental relationship with A.P. and Au.P. poses a threat to the well-being of the children.  Specifically, Father argues that "the trial court recited findings, but none with a nexus to the well-being of the children and their continued relationship with Father."  Father's Br. at 6.

As we note above, a trial court's judgment pertaining to termination of parental rights is clearly erroneous "if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *Bester*, 839 N.E.2d at 147.  We look to both the parent's habitual pattern of conduct and his fitness at the time of the termination hearing to determine whether there is a substantial probability of future neglect or deprivation. *Id*. at 152.  Moreover, we "can reasonably consider the services offered by [SDCS] to the parent and the parent's response to those services." *McBride v. Monroe Cnty. Office of Family and Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).  We are ever mindful that parental rights, while constitutionally protected, are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination. *Id*.  Indeed, a court need not wait until children are irreversibly harmed such that their physical, mental, and social development are permanently impaired before terminating the parent-child relationship. *Id*.

12

Here, the trial court found the following with regard to Father:

10. Father was . . . held in contempt on April 6, 2011 for failure to maintain contact with [SDCS] and for failure to visit the children . . . . The contempt action had been initiated on July 12, 2010, but could not proceed to hearing until nine (9) months later because of the inability of [SDCS] to obtain service earlier on [F]ather. Two different publication efforts based upon Affidavits of Diligent inquiry were necessary as [F]ather could not be served at his last known address and [F]ather failed to maintain contact with [SDCS] or [to] notify [SDCS] of any address change.

11. Father attended only three hearings during the CHINS proceedings; each of those times he was in the custody of the Sullivan County Sheriff's Department. He failed to voluntarily attend any CHINS hearing. He did attend all four termination hearings, including the initial hearing. However, he was one and one-half hours late to the December 21, 2011 session. Father has shown a pattern of failure to attend court proceedings concerning his children in the CHINS actions and in the paternity cases.

12. Father, in essence, did nothing during the CHINS case.

* * * *

27. The Guardian ad litem, Jennifer Hawkins, attempted to reach [F]ather as preparation for her report, but, consistent with his behavior throughout the CHINS cases, he was unavailable in that his telephone did not work and Mrs. Hawkins' attempts to reach [F]ather by mail were also unsuccessful. The GAL was left with the conviction that father lacked interest in the CHINS and termination proceedings. Consequently, his parental rights should be terminated.

(Mother's App. 24-27).

The evidence presented and described by the trial court in its findings shows that Father put forth little or no effort to become a responsible parent through the services provided by SDCS. Furthermore, he showed no interest in participating in hearings pertaining to the children's welfare or in maintaining contact with the children's court appointed guardian. In short, there is no evidentiary basis to allow the trial court to conclude that Father's neglect would not continue and that the continued neglect did not

13

pose a threat to the well-being of the children. The trial court's findings support its conclusion that there was a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of both A.P. and Au.P.

b.      *Best Interests*

Father contends that the trial court erred in determining that the termination of the parent-child relationship was in the children's best interests. He argues that he and the children developed a loving bond when he allegedly engaged in unauthorized visits with them. In support of his contention, Father points to the maternal grandmother's testimony that he did engage in unauthorized visits and that "he's wonderful with the kids" and that the children "love him" and "he loves them just as much." (Tr. 246). Father also points to Mother's testimony that termination of the parent-child relationship would be hard on the children. Father further points to testimony indicating that Nathan Noel, the SDCS family case manager, did not know that Father maintained a relationship with the children.

As we noted in our discussion of Issue 1(b), a determination of the best interests of the children should be based on the totality of the circumstances. *Lang*, 861 N.E.2d at 373. In making this determination, the trial court must subordinate the interests of the parent to those of the children involved. *In re A.K.*, 924 N.E.2d at 224.

Here, both the guardian ad litem and the family case manager concluded that termination of Father's parental rights was in the best interests of the children. Given the trial court's discretion to determine the credibility of evidence, including evidence regarding Father's continuing pattern of neglect towards the children, we cannot say that

14

the trial court erred in giving credence to the guardian ad litem's and family case manager's professional opinions regarding the best interests of the children.

With regard to the positive testimony of Mother and the maternal grandmother at the termination hearing, we again note that the trial court is not required to believe or assess the same weight to evidence as the person citing the evidence. *See Thompson*, 804 N.E.2d at 1149.[3]

Affirmed.

FRIEDLANDER, J. and BROWN, J., concur.

---

[3] This is especially true given the guardian ad litem's official report, in which Grandmother is reported to have stated that Father was a bad influence on Mother; was possibly still married to someone else; and had inappropriately touched one of the children during an unauthorized visitation. (Mother's App. 110).