**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Mar 19 2014, 6:58 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ERIN L. BERGER**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) |
| Z.S., K.S., and M.W., (Minor Children), | ) ) |
| S.S. (Mother), | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) No. 82A04-1307-JT-412 ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Brett J. Niemeier, Judge
Cause No. 82D01-1212-JT-113, JT-114, JT-115

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

S.S. ("Mother") appeals the termination of her parental rights to her children Z.S., K.S., and M.W. We affirm.

## Issue

The sole issue before us is whether there is sufficient evidence to support the termination of Mother's parental rights.

## Facts

The evidence most favorable to the trial court's judgment is that on January 30, 2012, the Department of Child Services ("DCS") removed K.S., born in 2009, M.W., born in 2010, and Z.S., born in 2011, from Mother's care in Evansville. The initial reason for the removal was that Z.S. had bruising and swelling of his face, head, and lips. Mother later blamed Z.S.'s condition on a boyfriend in whose care she had temporarily left Z.S., and the boyfriend was later charged with neglect of a dependent and battery. Further investigation also revealed that none of the children had received any vaccinations, nor did they have a doctor. Z.S., in fact, had not been seen by a doctor since his birth. An inspection of Mother's residence indicated there was inadequate bedding for the children, who apparently slept on a couch. Mother also was unemployed and admitted to having recently smoked marijuana. DCS considered placement of the children with Mother's mother ("Grandmother"), but she was not deemed an acceptable guardian because of her

criminal history. The children were instead placed in foster care and subsequently were declared to be CHINS.

Mother was ordered to undergo random drug testing and counseling as needed as part of the CHINS disposition. Between February 2012 and February 2013, Mother completed only thirty of fifty-six scheduled drug screens, and she tested positive for marijuana on eight occasions. She also tested positive for benzodiazepines in December 2012. Mother began attending a drug abuse treatment program in October 2012, after being held in contempt for missing a number of drug screens (as well as visitations and parenting counseling sessions), but she stopped attending the program in January 2013 without successfully completing it.

During the course of the CHINS proceedings, Mother was evicted from her public housing apartment, she moved in with Grandmother, and she never again obtained her own housing. Mother also was unemployed or at best only minimally employed during the CHINS proceedings, despite receiving employment assistance from a parenting aide. Her last paying job was through a temp agency in approximately February 2013. At that time, she worked for four weeks at $8 an hour for eleven hours per week. Mother also had another job through the temp agency for six months in 2012, at the same rate of pay and hours per week. Other than the two temporary jobs, Mother had no employment or any source of income, including public assistance. Mother also did not have a high school diploma. Although she attended a GED orientation session, she failed to follow through by attending classes.

3

After their removal, the foster parents noted troubling behaviors by K.S. and M.W. K.S., in particular, displayed highly inappropriate sexual behaviors, especially for a two-and-a-half year-old child. The children also exhibited food hoarding behaviors, such as fighting over food, eating food off the floor, and crying whenever leftover food was thrown away. K.S.'s and M.W.'s behaviors significantly improved during their time in foster care with their participation in counseling. The foster parents wish to adopt all three children.

Mother successfully completed one parental counseling class. Counselors did note efforts by Mother to learn from the class and to apply things she learned during supervised visitations with the children. However, between February 2012 and February 2013, Mother could have had ninety-six visitations, but in fact only fifty-four were scheduled because of Mother's failure to schedule more of them. Of the fifty-four scheduled visitations, Mother attended forty. Mother was always late to those two-hour long visitations, sometimes as much as an hour. Grandmother also sometimes attended the visitations but displayed a temper with the children, often telling them to "shut up" and one time grabbing K.S. by the arm and jerking him. Tr. p. 160. Mother also failed to participate in individual counseling as ordered by the trial court, failed to take advantage of a parenting aide to help with housing and employment and, as noted, failed to complete drug abuse treatment. Mother believed it was "too stressful" to participate in services and, when not working for brief periods of time, would spend most of her day sleeping. Id. at 27.

The DCS filed a petition to terminate Mother's parental rights. During the termination hearing, Mother testified that she believed the children should be placed in the custody of Grandmother until she could "get on [her] feet." Id. at 29. Mother also was

4

asked if she believed that she was "making a real effort to get [her] children back?" and she responded, "No." Id. Mother also testified that she had not applied for any permanent jobs in six months. The trial court subsequently entered an order with findings terminating Mother's parental rights. Mother now appeals.

**Analysis**

"When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility." In re I.A., 934 N.E.2d 1127, 1132 (Ind. 2010). We consider only the evidence and reasonable inferences most favorable to the judgment. Id. "We must also give 'due regard' to the trial court's unique opportunity to judge the credibility of the witnesses." Id. (quoting Indiana Trial Rule 52(A)). Where a trial court enters findings of fact and conclusions thereon, as the trial court did here, we apply a two-tiered standard of review. Id. "First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." Id. We will set aside the trial court's judgment only if it is clearly erroneous, which occurs if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. Id.

A petition to terminate a parent-child relationship must allege:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

5

(iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS has the burden of proving these allegations by clear and convincing evidence. I.A., 934 N.E.2d at 1133. We also keep in mind "that parental rights, while constitutionally protected, are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination." McBride v. Monroe County Office of Family & Children, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

Mother argues that there was insufficient evidence either that the conditions resulting in the children's removal would not remedied, or that continuation of the parent-

child relationship poses a threat to the well-being of the children. The trial court found sufficient evidence to support a conclusion as to both. Because the termination statute is written in the disjunctive, the DCS was only required to prove one or the other, but not both.[1] See Bester v. Lake County Office of Family & Children, 839 N.E.2d 143, 148 n.5 (Ind. 2005). We will focus our analysis upon whether there is sufficient evidence that continuation of the parent-child relationship poses a threat to the well-being of the children and need not determine whether there was a reasonable probability that the conditions leading to the children's removal from Mother's home would not be remedied. See id.

"In determining whether the continuation of a parent-child relationship poses a threat to the children, a trial court should consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." In re A.P., 981 N.E.2d 75, 81 (Ind. Ct. App. 2012). Courts must also judge a parent's fitness to care for her child as of the time of the termination hearing, taking into consideration any evidence of changed conditions. Id. Courts also may consider any services offered by the DCS and a parent's response to those services. In re L.B., 889 N.E.2d 326, 339 (Ind. Ct. App. 2008). "When evaluating a parent's habitual pattern of conduct, courts have properly considered, among other things, evidence of a parent's prior drug and alcohol abuse, history of neglect, and failure to provide financial support." Id. Additionally, the failure to exercise the right to visit one's own children may demonstrate a lack of commitment to preserving the parent-child relationship. Id.

---

[1] There is no evidence that any of the children had twice previously been found to be CHINS, as allowed for a third grounds for termination under Indiana Code Section 31-35-2-4(b)(2)(B)(iii).

Mother does not directly challenge any of the trial court's findings supporting its conclusion that continuation of the parent-child relationship posed a threat to the children. Among other things, the trial court made findings regarding Mother's financial and housing instability, her failure to make any attempt at gaining employment in the six months prior to the termination hearing, the likelihood that it would be difficult to obtain gainful employment without obtaining a GED, her continued use of illegal drugs, her failure to complete any services aside from the parenting class, and her frequently missed or significantly late-to visitations. The trial court also noted the maladaptive behaviors K.S. and M.W. were exhibiting at the beginning of their foster care placement, the fact that the children were being medically neglected at the time of their removal, and the poor condition of Mother's home at that time. It further noted Mother's admissions that she spent most of her days sleeping and had not put much effort into trying to regain custody of her children.

Despite these unchallenged findings, Mother essentially wants us to focus on evidence that reflects favorably upon her while disregarding unfavorable evidence. Namely, she points to her completion of the parenting class and testimony from counselors that she appeared to be learning from the program and was attempting to apply what she learned during supervised visitations. For us to accept Mother's focus, however, would constitute reweighing the evidence, which we cannot do. The evidence and findings we have noted above demonstrate habitual patterns of conduct indicative of a substantial probability of future neglect or deprivation, thus supporting the conclusion that continuation of the parent-child relationship would pose a threat to Z.S., K.S., and M.W.

Mother also argues there is insufficient evidence that termination of her parental rights is in the children's best interests. In determining whether termination is in the best interests of a child, courts may look beyond the factors identified by the DCS and look to the totality of the evidence. In re I.A., 903 N.E.2d 146, 155 (Ind. Ct. App. 2009). In making a best interests determination, courts must subordinate the interests of the parent to those of the child. Id. Courts need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Termination of parental rights is in a child's best interests if his or her emotional and/or physical development is threatened. Stewart v. Randolph County Office of Family & Children, 804 N.E.2d 1207, 1212 (Ind. Ct. App. 2004), trans. denied.

There is a lack of evidence in the record as to precisely what caused K.S. and M.W. to develop extremely inappropriate sexualized behaviors and troubling behaviors related to food hoarding. Nonetheless, those behaviors developed while they were in Mother's care and were being successfully corrected while they were in the care of the foster parents and attending counseling. The children also were not receiving proper medical care prior to their removal from Mother and did not have appropriate bedding in Mother's home. Mother believed it would be best for the children to be placed in Grandmother's care, although Grandmother had previously been ruled out as an appropriate placement for the children because of her criminal record and she also had displayed inappropriate behavior toward the children during supervised visitations. Rather than placing the children in such a situation, their current foster parents, with whom the children have been vastly improving since their placement, wish to adopt them. There is sufficient evidence that it is in the best

9

interests of the children for Mother's parental rights to be terminated so as to allow permanency of the children with their foster parents and to avoid the very real threat of physical and/or mental harm to the children.

## Conclusion

There is sufficient evidence to support the termination of Mother's parental rights to Z.S., K.S., and M.W.  We affirm.

Affirmed.

ROBB, J., and BROWN, J., concur.