## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 26 2016, 10:04 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Joann M. Price
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of R.G.M. (Minor Child) and | February 26, 2016 |
| | Court of Appeals Case No. 45A05-1507-JT-924 |
| R.M. (Father), | Appeal from the Lake Superior Court |
| *Appellant-Respondent,* | |
| v. | The Honorable Thomas P. Stefaniak, Jr., Judge |
| The Indiana Department of Child Services, | Trial Court Cause No. 45D06-1403-JT-36 |
| *Appellee-Petitioner* | |

**Crone, Judge.**

## Case Summary

R.M. ("Father") appeals the trial court's order involuntarily terminating his parental relationship with his son R.G.M. Father claims that several of the court's conclusions are clearly erroneous. Finding no error, we affirm.

## Facts and Procedural History

The relevant facts are undisputed. R.M. met J.G. ("Mother") in August 2009 and moved in with her shortly thereafter. Mother gave birth to R.G.M. in May 2010. In June 2011, Father had a domestic dispute with Mother in R.G.M.'s presence. He subsequently plead guilty to class D felony strangulation in Lake Superior Court. Father was sentenced to thirty months in jail, with twenty-four months suspended to probation. He was ordered to complete an alcohol and drug program, "participate in anger management, report monthly to his probation officer, and pay fees. Additionally, Father was to have no contact with Mother." Appellant's App. at ii (trial court's order).

In December 2011, Father moved out of the family home. In February 2012, he moved to St. Louis, Missouri, "and began working for a circus that traveled about the country. Father knowingly violated his probation when he left the state of Indiana." *Id*. at iii.

> Additionally, Father stopped participating in probation ordered services on or about February 2012. In March 2012, Father temporarily returned to Indiana to report to his probation officer.

In April 2012, seven months into his twenty-four month probation period, the Father stopped reporting monthly to his probation officer and ceased participating in the [alcohol and drug] program. In August 2012 Father was ordered to appear in court on September 17, 2012 and failed to appear. Father has had no contact with his probation officer since April of 2012.

*Id*.

[4] On August 28, 2012, the Indiana Department of Child Services ("DCS") and law enforcement officers made an unannounced visit to Mother's home after receiving a report regarding the safety of two-year-old R.G.M.

Mother was not present and was in the hospital for a urinary tract infection, a staph infection, and scabies for three days. Mother's boyfriend, M.Q., was temporarily caring for R.G.M. At the time, Mother and M.Q. had been dating a few months. Officers saw that R.G.M. had multiple bruises covering his face and neck. Officers also observed a plastic water bottle with aluminum foil covering the top in the home that appeared to have been recently used to smoke marijuana. Officers also discovered a baggy containing marijuana. Upon further inspection of R.G.M., DCS and officers discovered the child had bruises all over his body, including his face, eyelid, chin, neck, ear, arms, and genitals. The bruises appeared to be at different stages of healing. R.G.M.'s penis was found to have significant purple and black bruising. R.G.M.'s eyelid had red and purple bruising. M.Q. explained that the bruises on R.G.M. were sustained from him tossing and turning in his bed, however his explanation was not consistent with the nature of injuries and they appeared to be non-accidental. R.G.M. was taken immediately into DCS custody and placed in the foster home of Nancy Cloonan.

During the preliminary inquiry and investigation conducted by

DCS on August 28, 2012, Mother informed DCS that she was unaware of Father's whereabouts. Mother also informed DCS Father provides no emotional or financial support to R.G.M. Mother also stated that there was a history of domestic violence between Father and Mother and she had a restraining order against him.

*Id*. at i-ii.[1]

[5] On August 30, 2012, DCS filed a petition alleging that R.G.M. was a child in need of services ("CHINS") based on the evidence of physical abuse. In October 2012, the trial court held a hearing at which Father did not appear and Mother admitted the material allegations of the petition. The trial court found that R.G.M. was a CHINS and authorized service by publication on Father. At a January 2013 hearing, the trial court found that publication on Father had been completed and reaffirmed the CHINS finding.

Services were offered to Father and Mother pursuant to a case plan. Father and Mother were to contact the DCS case manager weekly, keep all appointments with service providers, maintain suitable housing, prohibit the use of drugs, prohibit the use of alcohol, obey the law, actively participate in a home-based counseling program for all members of the family, complete a parenting assessment and successfully complete all recommendations of the parenting assessment, complete a substance abuse assessment and follow all treatments and successfully complete all treatment recommendations, submit to random drug/alcohol screens within one hour of request, complete psychological evaluations, meet all the medical and

---

[1] The order occasionally refers to persons by their full names; we use initials where appropriate.

mental health needs of R.G.M., and participate in supervised visits.

*Id*. at ii.

DCS attempted to locate Father via the last known address listed on the Lake County Superior Court Docket to no avail. Service providers were also unsuccessful in locating Father at his last reported address.

In May 2013, DCS restarted the search for Father and attempted to contact him at the address listed on Father's open criminal case in Lake County and at a second address that was returned during a Whitepages search. Both addresses generated undeliverable mail responses. DCS then learned from the Mother that the paternal grandmother, K.H., lives in St. Louis, Missouri, however she provided no address. DCS obtained an address in St. Louis that listed both the Father and paternal grandmother, however notices were returned undeliverable. DCS also completed a VINELink.com search in Indiana and Missouri that returned no results regarding the Father's whereabouts or incarceration status. In June 2013, DCS utilized an investigator … to attempt to locate the [F]ather. The investigator found a second St. Louis address for the Father. DCS sent notices and letters to his address however, they were also returned as undeliverable.

….

In June 2013, Father was arrested in Missouri for auto theft and credit card fraud. He was put in county lockup from June 2013 to October 2013. In October 2013, Father was transferred to a Missouri Department of Corrections facility to serve his sentence for the two charges. His anticipated release is in January of 2016 which was unknown to DCS at the time.

*Id*. at ii-iii.

> In November 2013, the DCS caseworker began preparing the
> termination of parental rights petition for the child. The DCS
> caseworker happened to Google Father and found a recent news
> article regarding his arrest in Missouri. DCS contacted the
> Missouri Department of Corrections, confirmed that he was
> incarcerated, and received information on where he was
> currently incarcerated.

*Id*. at iii.

[6] On March 6, 2014, DCS filed a petition for the involuntary termination of Mother's and Father's parental rights.

> On March 7, 2014, DCS sent a letter to Father in the facility in
> which he was housed. On March 17, 2014, the DCS caseworker
> received a phone call from the paternal grandmother who stated
> the Father received the letter. The DCS caseworker informed the
> paternal grandmother that R.G.M. was in DCS custody, that
> Father could write and call the DCS caseworker, and there was a
> hearing set for July 14, 2014 to terminate the parental rights of
> Father. On March 18, 2014, Father contacted the DCS
> caseworker via telephone. Additionally, DCS sent Father
> certified correspondence including court documents that
> specified services he was to complete pursuant to the case plan.
> The DCS caseworker informed the Father that DCS could not
> provide him services in St. Louis, however if he were to complete
> similar services through the Missouri Department of Corrections
> and provide proof of their completion, they would count towards
> completion of the court ordered services. DCS never received
> any proof that the [F]ather completed any of the court ordered
> services. Also, DCS received no further correspondence or
> phone calls from the Father until 2015.

*Id.*

[7] On May 21 and 22, 2015, the trial court held a hearing on the termination petition at which Mother appeared in person and Father appeared by telephone from prison in Missouri.[2] Both were represented by counsel. The trial court took the matter under advisement. On June 16, 2015, the court issued an order containing the foregoing as well as the following relevant findings and conclusions:[3]

> There is a reasonable probability that the conditions resulting in the removal of the child(ren) will not be remedied ….
>
> ….
>
> Currently there is an outstanding warrant of detainer in Indiana for Father and upon release from Missouri incarceration, Father must face that probation revocation proceeding.
>
> Father has not participated in any of the services offered by DCS through the parenting plan. Father had minimal interaction with R.G.M. from February 2012 to July 2012. Since July 2012, Father has not had any interaction with R.G.M. Father has not [been] and is not a significant part of R.G.M.'s life. Father did not know the whereabouts of R.G.M. from approximately

---

[2] The transcript and the table of contents incorrectly state that the hearing was held on March 21 and 22, which fell on a weekend. Tr. at 2, 387. DCS's brief perpetuates this error, and Father's brief states that the hearing occurred on June 16, when the trial court issued its order. Father included several dozen pages of the transcript in his appellant's appendix in violation of Indiana Appellate Rule 50(F), which states, "Because the Transcript is transmitted to the Court on Appeal pursuant to Rule 12(B), parties should not reproduce any portion of the Transcript in the Appendix." Also, Father neglected to include a copy of the chronological case summary, which is required by Appellate Rule 50(A)(2)(a).

[3] We appreciate the thoroughness of the trial court's order, which greatly facilitated our review.

August 2012 to March 2014.

Father's lack of interaction with R.G.M. since July 2012 shows that Father is not interested in acting as a parent and that he lacks a bond with R.G.M. Father's repeated involvement with criminal activity and domestic violence during R.G.M.'s life exhibits a pattern that is not indicative of an individual who can be a positive influence in R.G.M.'s life. Father's failure to participate in any services offered under the DCS parenting plan shows his lack of interest in gaining the skills necessary to parent R.G.M. Father isn't in a position to parent a child with the special needs R.G.M. has from a prison cell.

….

Mother last interacted with R.G.M. in May 2014. To date, there is no objective evidence that Mother has rectified the concerns which resulted in R.G.M.'s removal from the home. Mother's actions and lack of progress constitute a pattern of conduct which significantly increases the probability of future neglect or endangerment of R.G.M.[4]

….

The child is thriving in his placement. Initially, the child was non-verbal and appeared delayed in his development. R.G.M. has remained under the foster care of Nancy Cloonan in a stable, caring, and loving environment for a total of nearly three years. Due to his autism, R.G.M. requires constant around the clock care which he receives from Ms. Cloonan. Also, she has been instrumental in providing access to appropriate therapy and regular medical care that have greatly minimized R.G.M.'s

---

[4] The order contains many other findings regarding Mother's "pattern of conduct." Because she does not appeal the order, we do not reproduce them here.

behavioral and developmental problems. Ms. Cloonan has demonstrated she has provided a structured environment and possesses the required skills needed to parent R.G.M.

There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child(ren) in that: for the reasons stated above. Additionally, the child deserves a loving, caring, safe, and stable home. The child has special needs and has been diagnosed with autism. The child requires specific and repetitive redirection and a very structured environment. The child requires around the clock care and supervision. The child requires continued therapy in order to function in reality. It is unlikely that [M]other would follow through with continued therapy, due to [M]other being in such denial about circumstances involving the removal of this child, the need for continued care, and the need for [M]other to progress in her parenting skills. Mother cannot provide the basic needs for the child. R.G.M.'s need for permanency is apparent. The needs of R.G.M. outweigh both Mother's and Father's rights to parent him and both Mother and Father currently are unable to properly parent him.

It is in the best interest of the child(ren) and his health, welfare and future that the parent-child relationship between the child(ren) and his parents be forever fully and absolutely terminated.

[DCS] has a satisfactory plan for the care and treatment of the child(ren) which is Adoption by the foster parent, Nancy Cloonan.

*Id.* at i, iii-vi. Father now appeals.

## Discussion and Decision

"The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008) (citation omitted). "[T]ermination is intended as a last resort, available only when all other reasonable efforts have failed." *Id*. That said, "[t]he trial court need not wait until a child is irreversibly harmed such that his physical, mental, and social development are permanently impaired before terminating the parent-child relationship." *Id*. at 807.

A petition for the involuntary termination of parental rights must allege in pertinent part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> …

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove "each and every element" by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009); Ind. Code § 31-37-14-2. If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[10] "We have long had a highly deferential standard of review in cases involving the termination of parental rights." *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

> We neither reweigh evidence nor assess witness credibility. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*Id.* at 92-93 (citations omitted). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).

Father does not specifically challenge the validity of any of the trial court's findings. He does, however, suggest that the findings do not support its conclusions regarding Indiana Code Section 31-35-2-4(b)(2)(B), -(C), and -(D). We address each conclusion in turn.

## Section 1 – The trial court did not clearly err in concluding that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to R.G.M.'s well-being.[5]

Father asserts that "there was no evidence to support the contention that [he] ever presented a risk to the safety and well-being" of R.G.M. Appellant's Br. at 16. "In determining whether the continuation of a parent-child relationship poses a threat to the children, a trial court should consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re A.P.*, 981 N.E.2d 75, 81 (Ind. Ct. App. 2012). "At the same time, however, a trial court should judge a parent's fitness to care for [his] child as of the time of the termination proceedings, taking into consideration evidence of changed conditions." *Id.*

Father committed an act of domestic violence against Mother in one-year-old R.G.M.'s presence, which resulted in Father's incarceration and probation. Father knowingly violated his probation by moving to Missouri and committed

---

[5] Father also contends that the trial court clearly erred in concluding that there is a reasonable probability that the conditions resulting in R.G.M.'s removal will not be remedied. Because DCS is required to prove only one of the elements of Indiana Code Section 31-35-2-4(b)(2)(B), we need not address this contention.

additional crimes there, which again put him in jail. After serving his sentence in Missouri, he must face a probation revocation proceeding in Indiana, which could result in two more years in jail. Father has had no interaction with R.G.M. since July 2012 and provided no documentation that he has participated in, let alone completed, any services offered under DCS's parenting plan. Father's history of criminal activity, chronic instability, and demonstrated lack of interest in his son pose a significant threat to the well-being of R.G.M., who requires around-the-clock structure and supervision. As such, we cannot say that the trial court's conclusion is clearly erroneous.

## Section 2 – The trial court did not clearly err in concluding that termination is in R.G.M.'s best interests.

[14] A determination of a child's best interests should be based on the totality of the circumstances. *Id*. at 82. In making this determination, the trial court must subordinate the parent's interests to those of the child involved. *Id*. A parent's historical inability to provide a suitable environment along with his current inability to do the same supports a finding that termination of parental rights is in the child's best interests. *Id*. "[A] child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010), *trans. dismissed*.

[15] Father asserts, "There was nothing substantive presented at trial to show that a continued relationship between [him] and [R.G.M.] would be detrimental" to

R.G.M. Appellant's Br. at 18-19. On the contrary, Father physically abused Mother when R.G.M. was an infant. Father was incarcerated and knowingly violated his probation by moving out of state. Father had minimal contact with R.G.M. while he was on the lam, and he was incarcerated again after committing additional crimes in Missouri. R.G.M. suffered significant physical abuse while in Mother's care, and his only stable and supportive presence since that traumatic period has been foster parent Cloonan. Father has had no contact with R.G.M. since July 2012, and he faces a probation revocation proceeding that could result in two more years in jail. "Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Matter of A.C.B.*, 598 N.E.2d 570, 572 (Ind. Ct. App. 1992).

[16] Moreover, DCS family case manager Tashame Woods testified that Father is unable to parent R.G.M. "at this point in time" and that, given R.G.M.'s autism and need for permanency, it would not be in his best interests to wait "one and a half years, two years to see whether [Father] could get his act together[.]" Tr. at 364. Father's insistence that he and his family "are of sufficient capability to care for [R.G.M.] and his specialized needs" is merely an invitation to reweigh evidence in his favor, which we may not do. Appellant's Br. at 19. In sum, the trial court's conclusion regarding R.G.M.'s best interests is not clearly erroneous.

## Section 3 – The trial court did not clearly err in concluding that there is a satisfactory plan for R.G.M.'s care and treatment.

[17] Finally, Father challenges the trial court's conclusion that DCS has a satisfactory plan for R.G.M.'s care and treatment, which is adoption by foster parent Cloonan. Father's argument is essentially a rehash of his best interests argument: that he and his family could take care of R.G.M. as well as or better than Cloonan.[6] Again, we must decline Father's request to reweigh the evidence in his favor. We find no error here and therefore affirm the trial court's order.

[18] Affirmed.

Vaidik, C.J., and Bailey, J., concur.

---

[6] Father cites Indiana Code Section 31-34-19-7, which addresses a child's placement with a "willing relative" during a CHINS proceeding and therefore is irrelevant as to a DCS permanency plan in a termination proceeding.