## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 04 2018, 9:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mary P. Lake
Lake Law Office
LaPorte, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of A.S., M.M., and T.S. (Minor Children) and

J.M. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

October 4, 2018

Court of Appeals Case No. 18A-JT-585

Appeal from the LaPorte Circuit Court

The Honorable Thomas J. Alevizos, Judge

The Honorable W. Jonathan Forker, Magistrate

Trial Court Cause Nos.
46C01-1606-JT-213
46C01-1606-JT-214
46C01-1606-JT-215

**Mathias, Judge.**

[1] The LaPorte Circuit Court granted the Department of Child Services's ("DCS") petition to terminate J.M.'s parental rights to her three minor children. J.M. appeals and argues that there was insufficient evidence to support the trial court's order terminating her parental rights.

[2] We affirm.

## Facts and Procedural History

[3] Three of J.M.'s four children are the subject of these termination proceedings: M.M. born in February 2005, T.S. born in July 2006, and A.S. born in February 2008.[1] The fourth child now resides with his biological father.

[4] Until the fall of 2014, Mother and the children lived in White County. DCS investigated multiple allegations of abuse while the family lived in White County. DCS continued their involvement with the family after they moved to LaPorte County, and J.M. agreed to an informal adjustment because she wanted to receive assistance for her addiction issues. J.M. was participating in a suboxone program, and she agreed to participate in urine screens, parenting education, and case management services.

[5] J.M. was dismissed from the suboxone program in March 2015. J.M. stopped communicating with DCS and refused to submit to a drug screen. Eventually, a

---

[1] M.M.'s, T.S.'s, and A.S.'s biological father is deceased.

DCS caseworker was able to speak to one of the children at school, and she learned that the children were being disciplined inappropriately by J.M.'s boyfriend.

[6] DCS removed all four children from J.M.'s home in May 2015 due to allegations of neglect. Specifically, DCS discovered that J.M.'s home lacked electricity, the children did not have adequate food, J.M.'s boyfriend was using a belt to discipline the children, and the landlord was planning to evict the family from the home. J.M. finally submitted to a drug screen and tested positive for THC and methadone.

[7] A Child(ren) In Need of Services petition ("CHINS") was filed shortly thereafter, and on June 24, 2015, the children were adjudicated CHINS. J.M. admitted that the children were CHINS. In March 2016, DCS moved to dismiss the CHINS adjudication with regard to J.M.'s youngest child because his father had been granted custody in a related proceeding in LaPorte Superior Court.

[8] J.M. has struggled with drug abuse since she was approximately ten years old. J.M. is addicted to opiates and has used heroin. She also has a number of health conditions requiring numerous prescription medications. J.M. has participated in a methadone clinic and a suboxone program to address her addiction to opiate drugs to no avail.

[9] During the first few months of the CHINS proceedings, J.M. made little progress and failed to keep in contact with case managers. When J.M. met with her service providers, she expressed interest in working on issues, but she could

not retain what she had learned. J.M. failed to follow through on finding employment or housing. J.M.'s application for disability social security benefits was denied and she failed to appeal the decision. J.M. was encouraged to seek in-patient treatment for her drug abuse, but she chose to enroll in a methadone program.

[10] In October 2015, J.M. was accepted into a shelter called the Caring Place. She made significant progress for approximately three months while she resided at the shelter. Caring Place provided substance abuse treatment and other programs that assisted J.M. in addressing her anger, parenting, and mood issues. J.M. obtained employment, and her visits with the children proceeded from supervised to partially supervised. DCS planned to allow J.M. to start overnight visitation with the children toward the end of December 2015.

[11] However, in early January 2016, J.M. was evicted from the Caring Place for her third violation of possession of an e-cigarette, which was against the shelter's rules. J.M.'s visits with the children were returned to fully supervised. J.M. also lost her job and resumed living with her former boyfriend. Once again, J.M. stopped communicated with her service providers.

[12] In January 2016, J.M. was accepted into another shelter, Day Spring. Shortly thereafter, J.M. had a positive drug screen. J.M. was insistent that she had not used illegal substances and took two additional drug screens that day, which were negative. However, Day Spring would not allow J.M. to continue to reside at the shelter because she often fell asleep during shelter programming.

[13] Thereafter, J.M. did not have a stable home and her participation in services became inconsistent. She attended visits with the children but was often late and would fall asleep during the visit. She also refused to submit to urine screens after visits. At one of her last visits with the children, J.M. told them she had a dream in which the entire family was violently murdered. J.M. refused a drug screen after the visit. J.M. also missed the next scheduled visitation.

[14] In March 2016, J.M. was arrested for theft and incarcerated for twenty-nine days. After she was released from jail, J.M.'s case manager had trouble contacting her, and J.M. would not participate in random drug screens. DCS requested that the CHINS court suspend J.M.'s visits with the children because caseworkers felt that she needed to address her mental and emotional health. The CHINS court agreed and suspended J.M.'s visits with the children. The court ordered that J.M. would not have visitation with the children until she attended at least three counseling sessions and her counselor recommended that visits with the children should resume.

[15] J.M. participated in one counseling session between March and July 2016. She began a suboxone program in June 2016. At a July 6, 2016 hearing, the trial court found that J.M. had not complied with the case plan since the last hearing, had not improved her ability to parent the children, her visitation with the children was suspended, and she had not cooperated with DCS. Therefore, the court ordered J.M. to participate in an inpatient drug treatment program. J.M. chose a treatment center, and DCS provided transportation to the

admissions interview. J.M. checked herself out of the treatment center after two weeks before the program was complete.

[16] On September 7, 2016, DCS filed a petition to involuntarily terminate J.M.'s parental rights to the children. In October 2016, the trial court ordered services suspended except for drug screens because J.M. had not complied with services, had not completed inpatient drug treatment, and had not participated in the services required before visitation with the children could resume.

[17] The termination fact-finding hearing was held on December 2, 2016, January 23, 27, and 30, 2017. For reasons not apparent in the record, the trial court did not issue its findings of fact and conclusions of law until January 31, 2018. The trial court terminated J.M.'s parental rights after concluding termination was in the children's best interests and

> [t]here is a reasonable probability that the conditions that resulted in the child[ren]'s removal or the reasons for placement outside the parent's home will not be remedied, and/or there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child[ren].

Appellant's App. p. 50. J.M. now appeals.

## Termination of Parental Rights

[18] We have consistently noted that the purpose of terminating parental rights is not to punish parents but instead to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights have a constitutional dimension, the law allows for the termination of such rights

when the parents are unable or unwilling to meet their responsibilities as parents. *Id.* Indeed, the parent's interests must be subordinated to the children's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009).

[19] The termination of parental rights is controlled by Indiana Code section 31-35-2-4(b)(2), which provides that a petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

[20] The burden is on DCS to prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2; *G.Y.,* 904 N.E.2d at 1260. As Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is required to find that

only one prong of that subsection has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. I.C. § 31-35-2-8(a). If the court does not find that the allegations in the petition are true, it shall dismiss the petition. *Id*. at § 8(b).

[21] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id*. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

[22] Indiana Code section 31-35-2-8(c) provides that the trial court "shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" to either terminate a parent-child relationship or to dismiss the termination petition. When the trial court enters such findings and conclusions of law, we apply a two-tiered standard of review. *A.D.S. v. Indiana Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. We first determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. "Findings are clearly

erroneous only when the record contains no facts to support them either directly or by inference." *Id*. (quoting *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996)). If the evidence and inferences support the trial court's decision, we must affirm. *Id*.

[23] J.M. argues that the evidence was insufficient to support the trial court's finding that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the well-being of the children. J.M. acknowledges that her efforts after leaving the Caring Place shelter in January 2016 were sporadic but argues that she has a strong bond with the children. She also claims that her housing was stable and adequate, and DCS did not evaluate her housing situation after she was released from jail in May 2016.

[24] As we address J.M.'s argument, we initially observe that a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before termination of the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). And to evaluate whether continuation of the parent-child relationship poses a threat to the child, a trial court "should consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation" while also judging a parent's fitness to care for his child as of the time of the termination proceedings, taking into consideration evidence of changed conditions. *In re A.P.*, 981 N.E.2d 75, 81 (Ind. Ct. App. 2012).

[25] Throughout the CHINS and termination proceedings, J.M. failed to address her substance abuse issues and tested positive for methadone and THC on multiple dates. DCS provided numerous services to assist J.M. over the course of these proceedings, but she failed to take advantage of the offered services. J.M.'s participation in services, including therapy, was sporadic. J.M. was unable to maintain employment or stable housing for any significant length of time after she was terminated from the Caring Place for rules violations. The children's behavior declined during visitations with J.M., therapeutic intervention at the visits was ineffective, and the visitation negatively impacted the children. In the months before J.M.'s visitation with the children was suspended, she appeared to be impaired during visitation or failed to attend visitation. J.M. also failed to complete parenting education and individual therapy. J.M.'s therapist concluded that J.M. failed to make progress in her ability to parent the children.

[26] The DCS proved by clear and convincing evidence that J.M. failed to address her substance abuse addiction, participate in therapy, maintain a stable home and income, and improve her parenting skills. For all of these reasons, we conclude that the trial court's finding that continuation of the parent-child relationship poses a threat to the children's well-being is supported by sufficient evidence.

[27] We therefore do not address J.M.'s arguments directed at the removal prong of Indiana Code section 31-35-2-4-(b)(2)(B). *See In re A.K.*, 924 N.E.2d at 220 (noting that section 4(b)(2)(B) is written in the disjunctive and that the trial court is required to find that only one prong of subsection (b)(2)(B) has been

established). Also, J.M. does not challenge the trial court's finding that termination of her parental rights is in the children's best interests, and therefore, we do not address that issue on appeal.

## Conclusion

J.M. has not established that she is entitled to relief on appeal. We therefore affirm the trial court's order terminating J.M.'s parental rights.

Affirmed.

Bailey, J., and Bradford, J., concur.