# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 29 2017, 10:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Anna Onaitis Holden
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

K.S. (Minor Child),

and

D.S. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

December 29, 2017

Court of Appeals Case No.
49A02-1707-JT-1499

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge
The Honorable Larry E. Bradley, Magistrate

Trial Court Cause No.
49D09-1612-JT-1199

**Baker, Judge.**

[1] D.S. (Father) appeals the juvenile court's order terminating his parent-child relationship with his daughter, K.S. Father argues that there is insufficient evidence supporting the juvenile court's conclusion that the conditions that resulted in K.S.'s placement outside Father's home would not be remedied, that the continuation of the parent-child relationship poses a threat to K.S.'s well-being, or that the termination of the parent-child relationship is in K.S.'s best interest. Finding the evidence sufficient, we affirm.

## Facts

[2] K.S. was born on November 11, 2012, to Father and C.B. (Mother).[1] Father and Mother were not married, and Mother was the custodial parent. Prior to 2012, Father had a substance abuse problem; sometime during 2012, he was incarcerated for six months for attempted theft. After his release, he did not visit K.S., per Mother's request.

[3] On March 4, 2015, the Department of Child Services (DCS) filed a petition alleging that K.S. was a child in need of services (CHINS) after Mother gave birth to a drug-positive baby.[2] DCS removed K.S. from Mother's care and placed her with a relative. She was not placed with Father because he had recently tested positive for methamphetamine and marijuana. At the time,

---

[1] Mother is not a party to this appeal.

[2] Father and the second child are not related.

Father had little to no relationship with K.S. The trial court ordered that Father have supervised parenting time with K.S.

[4] On March 25, 2015, Father admitted that K.S. was a CHINS because he needed to learn how to provide K.S. with a home environment free of substance abuse issues. The trial court found a sufficient factual basis to find K.S. to be a CHINS. A dispositional hearing took place the same day, during which the trial court ordered Father to participate in home based therapy and home based case management, complete a substance abuse assessment, submit to random drug screens, and follow all recommendations of service providers. On May 1, 2015, K.S. was placed in foster care.

[5] A review hearing took place on June 17, 2015. DCS reported that Father had completed one drug screen, which was clean, was not engaged in services, and was participating in parenting time. K.S.'s foster mother said that K.S. exhibited negative behaviors after Father's visits. Father stated that he missed his substance abuse assessment because of his work schedule; that he has stable housing and employment and that home based case management may not be necessary for him; and that he was willing to engage in home based therapy. Father requested unsupervised parenting time so that he could work toward a temporary trial visit for K.S. The trial court ordered that Father could have unsupervised parenting time upon completion of five consecutive clean drug screens.

[6]     In July 2015, K.S. began home based therapy with licensed mental health counselor Kate Rojek. K.S. exhibited symptoms of anger, acting out, erratic moods, oppositional behaviors, and hyperactivity. Rojek observed that K.S. had symptoms of adjustment disorder, meaning that she had observable, reactive, disproportionate symptoms to an identifiable stressor, and symptoms of post-traumatic stress disorder. Rojek also observed supervised visits between Father and K.S. During the initial visits, K.S. would become mute, anxious, and guarded, and would sit cross-legged on the floor with wide eyes and clenched fists. In contrast, when K.S. was with her foster family, she appeared happy and spoke frequently. In September 2015, Father and K.S. started supervised therapeutic visits; over time, K.S. demonstrated fewer physical symptoms of anxiety and began to appear more comfortable around Father.

[7]     At some point, B.B., who was Father's live-in girlfriend and who had custody of five children age five and under, wanted to be included in the therapeutic visitation sessions, along with her children, because she and Father wanted K.S. to live with them. Rojek did not think that B.B.'s participation was therapeutically appropriate for K.S., but allowed it because the plan and goal at that time was reunification of the family. When B.B. and her children attended the visits, K.S. would become mute, withdrawn, and more anxious. When Rojek spoke with Father alone about K.S.'s selective mutism and symptoms of post-traumatic stress disorder, Father was receptive to Rojek's explanations and plans for intervention that he could implement as the parent caregiver;

however, when B.B. joined the discussions, Father would agree with what B.B. wanted regarding therapeutic visitation.

[8] Another review hearing took place on September 16, 2015. DCS reported that Father was engaged in services and had produced clean drug screens. Rojek stated that K.S. was exhibiting symptoms of post-traumatic stress disorder, including during visits. K.S.'s foster mother also stated that K.S. was exhibiting symptoms, including yelling and night terrors, and that the behaviors escalated following visits. Rojek recommended continued therapeutic visits. Father expressed concern about the delay in starting unsupervised parenting time and stated that he was willing to continue K.S.'s therapy once she was placed in his care. The trial court ordered Father to participate in K.S.'s therapy and that unsupervised parenting time would not begin until Rojek made a positive recommendation.

[9] A permanency hearing took place on February 24, 2016. DCS reported that Father was not engaging in services, that Father and B.B. had been evicted from their home and were living in temporary housing, and that Father was participating in parenting time twice per week. DCS expressed continuing concern about K.S.'s behaviors following visits. Further, DCS reported that on February 4, 2016, a report was made that B.B. was abusing her own children. DCS recommended that B.B. also engage in services if she were to participate in visits with K.S. Rojek reported that K.S. had made progress; she could now manage her own symptoms, and Father and K.S. had developed a bond. However, K.S. was still acting out after visits. Rojek wanted Father to

complete a substance abuse assessment. Both Rojek and K.S.'s guardian ad litem expressed desire for Father to obtain stable housing. Father stated that he was unaware of the need to complete the substance abuse assessment because he had provided negative screens and was no longer asked to screen. The trial court authorized DCS to screen Father if it was deemed necessary and removed the requirement that he complete a substance abuse assessment.

[10] On June 22, 2016, DCS placed K.S. with Father and B.B. on a temporary trial visit.[3] Rojek supported the trial visit because K.S. had made good progress and, with the goal of reunification with Father, the plan was to continue to address issues while K.S. lived with Father. Rojek had concerns about B.B.'s mental health and her ability to care for so many children, but she did not think there was an imminent safety concern regarding K.S.'s placement.

[11] At first, K.S. appeared to be transitioning well, speaking frequently and not showing signs of anxiety. However, problems arose. In July 2016, the house became unclean, with trash and piles of clothes on the floor that made it hard to walk through rooms. B.B. said that she was overwhelmed caring for so many children because Father was working so many hours. In August 2016, the condition of the house worsened; there were problems with clothes, food, flies, and trash on the floor. The children had lice, which B.B. denied to the service providers. At some point, Father and B.B. presented a plan to address the

---

[3] The record is unclear about Father's housing at this point in time.

issue, saying that they were going to move, but Family Case Manager Caitlin Cincebox found out that they were actually being evicted. Also during K.S.'s visit, Father and B.B. allowed other people to stay with them without DCS approval. One of these people was B.B.'s uncle, for whom there was an active arrest warrant; another was Father's brother, who had recently been released from prison and was on house arrest. On October 1, 2016, Father's brother overdosed on heroin at home. On that day, Father had "tried to stay up as late as I could with him 'cause he was having a bad day and he does have problems." Tr. Vol. II p. 11.

[12] Father admitted to using methamphetamine on the day his brother overdosed so he could "escape reality." *Id.* at 7. On October 4, 2016, DCS removed K.S. from Father's home. Father had two visits with K.S. after her removal, the last one of which was on October 26, 2016. He missed a visit scheduled for November 4, 2016, after which K.S. became agitated and anxious. Meanwhile, on October 19, 2016, the trial court changed the permanency plan to adoption.

[13] After the change in the plan, Rojek recommended that the therapeutic visitations between Father and K.S. continue but decrease significantly in frequency in part because K.S. was demonstrating reactive attachment symptoms, meaning that she was exhibiting socially and emotionally withdrawn behavior toward caregivers, and in part because of the changed

plan.[4] Following her removal, K.S. indicated that she did not want to return to Father's home. K.S.'s foster mother observed that, upon K.S.'s return to her foster home, K.S. had more consistent nightmares and trouble remembering things and was fearful about having to return to Father's house. Rojek observed a "dramatic increase" in obsessive traumatic play, which is when a child demonstrates an obsessive need to role play traumatic experiences, that focused on K.S.'s experiences while in Father's care. *Id.* at 140. The play included:

- K.S. instructing Rojek to "stand on the wall" and be yelled at.
- K.S. locking herself in her bedroom and not allowing Rojek to enter.
- K.S. stating that B.B.'s children would "be in trouble."
- K.S. pushing Rojek when it was time to get in the car, as if to push her into a car seat.

*Id.* at 173. Rojek identified B.B., men, and strangers as some of K.S.'s triggers.

[14] In October 2016, Father was referred to an individual counselor, Teresa Troxell, to work on establishing stability in his life by creating appropriate boundaries and healthy relationships and to address his substance abuse. Troxell observed that Father made progress because in November or December 2016, he had ended his relationship with B.B., who had caused chaos in his life. But Troxell also noted that, immediately following the break-up, Father had moved in with family members, including his mother, who had caused chaos

---

[4] The record is unclear as to why Father's visits stopped altogether after he missed the November 4, 2016, visit.

for him in the past. Troxell observed two visits between Father and K.S. that went well. Father met with Troxell for between ten and fifteen sessions before stopping the services in December 2016 because he thought he did not need therapy, missed a session, and ignored Troxell's attempts to reach him.

[15] On October 25, 2016, Father completed a substance abuse assessment with William Taylor. Taylor identified four substances as being a problem for Father: benzodiapines, which Father stated he thought he was addicted to; marijuana; methamphetamine; and prescription opiates. Taylor found the following diagnostic impressions for Father: severe cannabis use disorder, possible sedative hypnotic use disorder, possible opioid use disorder, and stimulant use disorder.

[16] On December 2, 2016, DCS filed a petition for the termination of the parent-child relationship. On February 1, 2017, Father tested positive for amphetamines and methamphetamine. A hearing took place on June 1, 2017. Father testified that he thought K.S. was shy and did not talk, that he did not see that K.S. had triggers until around the time his brother overdosed, and that B.B. "was like a trigger for some reason, I don't know why. But it just made her shut down, made [K.S.] shut down and didn't want to talk or anything." *Id.* at 244. Father testified that he had a job, where he had worked for about a year, and was renting a one-bedroom apartment with his new girlfriend. K.S.'s foster mother testified that K.S. has a developmental delay and attends a developmental preschool.

[17] On June 13, 2017, the juvenile court granted the petition, finding, in relevant part, as follows:

> 8. [Father] participated in services and [K.S.]'s court hearings to the point that [K.S.] was placed in temporary in-home trial visitation with her father in June of 2016.
>
> 9. Although there were concerns with the poor and dirty conditions of the house, and outside persons residing in the home, [K.S.] remained with [Father] until early October of 2016, at which time she was detained outside the home after [Father] tested positive for methamphetamine and his brother overdosed in the home.
>
> 10. [Father] was referred for a substance abuse assessment which was conducted on October 25, 2016 with William Taylor.
>
> 11. Mr. Taylor reported his diagnostic impression of [Father] as Cannabis Use Disorder (severe), Sedative Hypnotic Use Disorder (Possible), Opioid Use Disorder (Possible), and Stimulant Use Disorder (Methamphetamine).
>
> 12. Follow-up drug treatment was recommended but no referral was made.
>
> 13. [Father] does not believe he has a drug issue at present but did in October of 2016.
>
> 14. Although there was an open drug screen referral, [Father] has taken one drug test during 2017, which was positive for amphetamine and methamphetamine.

15. [Father] has full-time employment and resides in a one-bedroom apartment with his girlfriend.

16. Home based therapy to address [Father]'s need to understand and create boundaries to establish stable and healthy relationships was not completed. [Father] did not feel therapy was necessary.

17. The home based therapist did not recommend placement of a child with [Father] without addressing how his boundary issues could negatively impact a child.

18. [Father]'s parenting time was consistent prior to [K.S.] being placed with him.

19. [Father] did not have a relationship with his daughter prior to the CHINS case. He developed a bond with [K.S.] but his last visit with [K.S.] was on October 26, 2016.

\*\*\*

26. [K.S.] has special needs and has been involved in therapy with Kate Rojek since July of 2015. She presents with symptoms of reactive attachment disorder and post-traumatic stress disorder.

27. [K.S.] is developmentally delayed, has had a neurological evaluation and will be in need of a psychological evaluation.

28. Therapist Rojek observed [Father] making choices not in [K.S.]'s best interests.

29. Therapist Rojek does not believe visits between [K.S.] and her parents would be in [K.S.]'s best interests and to return [K.S.] to her father would be harmful and could negatively affect [K.S.] long term.

30. [K.S.] does not mention her father to the therapist.

31. With the exception of the approximate four-month in-home placement with her father, [K.S.] has resided in the same foster home since May of 2015, almost two years.

32. [K.S.] has been observed as being happy and adjusted, and as being bonded to her foster parents. She identifies her caregivers as her permanency plan.

\*\*\*

38. There is a reasonable probability that the conditions that resulted in [K.S.]'s removal and continued placement outside the home will not be remedied by her father who has not addressed his substance abuse and does not believe he has a drug problem.

\*\*\*

40. Continuation of the parent-child relationship poses a threat to [K.S.]'s well-being in that it would pose as a barrier to obtaining permanency for [her] through an adoption where all [her] needs will continue to be met. . . .

41. The children's Guardian ad Litem believes it to be in [K.S.]'s best interests that [she] be adopted . . . .

42. Termination of the parent-child relationship is in the best interests of [K.S.]  Termination would allow [her] to be adopted into a stable and permanent home where [her] needs will be safely met.

43. There exists a satisfactory plan for the future care and treatment of [K.S.], that being adoption.

Appellant's App. Vol. II p. 16-18.  Father now appeals.

# Discussion and Decision

[18]  Father argues that the evidence does not establish that (1) there is a reasonable probability that the conditions that resulted in K.S.'s removal will not be remedied; (2) the continuation of the parent-child relationship poses a threat to K.S.'s well-being; or that (3) termination is in K.S.'s best interest.

# I.  Standard of Review

[19]  Our standard of review with respect to termination of parental rights proceedings is well established.  In considering whether termination was appropriate, we neither reweigh the evidence nor assess witness credibility. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013).  We will consider only the evidence and reasonable inferences that may be drawn therefrom in support of the judgment, giving due regard to the trial court's opportunity to judge witness credibility firsthand.  *Id.*  Where, as here, the trial court entered findings of fact and conclusions of law, we will not set aside the findings or judgment unless clearly erroneous.  *Id.*  In making that

determination, we must consider whether the evidence clearly and convincingly supports the findings, and the findings clearly and convincingly support the judgment. *Id.* at 1229-30. It is "sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005).

[20] Indiana Code section 31-35-2-4(b)(2) requires that a petition to terminate parental rights for a CHINS must make the following allegations:

> (A) that one (1) of the following is true:
>
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> >
> > (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
> >
> > (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1230.

## II.  Remedy of Conditions

As noted above, one of the ways to support a termination petition is for DCS to prove by clear and convincing evidence that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parent will not be remedied.

After K.S.'s removal from Mother on March 4, 2015, she was not placed with Father because he had tested positive for methamphetamine and marijuana. K.S. was first placed in Father's home on June 22, 2016, for a temporary trial

home visit. During her approximately three and one-half month stay with Father, Father abused substances; the condition of the house deteriorated to an unsanitary level; and Father and B.B. allowed other people to reside in the house with K.S., including Father's brother, who overdosed on heroin in the home.

[23] Although Father had several negative drug screens throughout the course of the CHINS proceeding, following his brother's overdose, he admitted to using drugs on the day of his brother's overdose and tested positive for drugs, thus establishing that he used drugs while K.S. lived with him. As for the condition of the house, it actually worsened during K.S.'s stay. Family Case Manager Cincebox testified that "the home had progressively been deteriorating in its condition," with visible mold growing in the living room, trash piled up in the kitchen, and raw sewage overflowing from a toilet. Tr. Vol. II p. 38. Father's substance abuse and the condition of the house indicate that, rather than making progress in his ability to provide K.S. with a safe and stable home, he was backsliding by continuing to make inappropriate and harmful choices.

[24] Moreover, Father's therapist expressed concern about Father's ability to set boundaries for himself that would help him provide a safe and stable living environment for K.S. This concern is supported by the fact that, during K.S.'s temporary trial visit, Father and B.B. allowed B.B.'s uncle and Father's brother to live in the same house as K.S., despite the fact that two of K.S.'s triggers are men and strangers. There was an active arrest warrant for B.B.'s uncle, and Father's brother overdosed in the home. Although the therapist noted that

Father made progress in establishing boundaries by ending his relationship with B.B., after he did so, he moved in with his mother and other family members; his mother had also caused problems in his life. Further, Father started another dating relationship almost immediately after ending his relationship with B.B. In short, Father's actions show that he cannot or will not maintain a stable life for himself or establish a safe and stable home for K.S. Accordingly, the trial court did not err by finding that the conditions that resulted in K.S.'s removal from Father's home would not be remedied.

## III. Threat to K.S.'s Well-Being

Because the requirements of the governing statute are disjunctive, and because we have already found that DCS proved that the conditions that resulted in K.S.'s removal from Father's home would not be remedied, we need not also address whether the parent-child relationship poses a threat to K.S.'s well-being. Nonetheless, we will address the issue given the seriousness of what is at stake in a termination case.

It is well established that a trial court need not wait until a child's physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). Therefore, termination is appropriate "[w]hen the evidence shows that the emotional and physical development of a [CHINS] is threatened . . . ." *Id.* In evaluating whether the continuation of the parent-child relationship poses a threat to the child, a trial court "should consider a parent's habitual pattern of

conduct to determine whether there is a substantial probability of future neglect or deprivation" while also judging a parent's fitness to care for his child as of the time of the termination proceedings, taking into consideration evidence of changed conditions. *In re A.P.*, 981 N.E.2d 75, 81 (Ind. Ct. App. 2012).

[27] We agree with Father's contention that the juvenile court's order focused too much on permanency with regard to K.S.'s well-being. As Father aptly stated, the juvenile court's reference to the parent-child relationship as a "barrier" to permanency shows "its improper focus on the hope of a 'better' home for K.S., if only Father's parental rights could be terminated." Appellant's Br. p. 20. And as our Supreme Court has stated, "termination should not result solely because there is a better home available for the children." *K.E. v. Indiana Dep't of Child Servs.*, 39 N.E.3d 641, 649 (Ind. 2015) (quotation marks and citation omitted).

[28] A better order would make more specific findings of fact and conclusions of law regarding whether the parent-child relationship poses a threat to K.S.'s well-being. But what Father's argument regarding the order overlooks is that the juvenile court did not base termination *solely* on the fact that a safe, stable, and permanent home existed for K.S. through adoption. In its order, the juvenile court noted that Father abused drugs, that his brother overdosed in the home while K.S. lived there, that Father refused to admit that he had a drug problem, that Father did not think therapy was necessary, that Father made choices that were not in K.S.'s best interests, and that returning K.S. to Father could negatively affect K.S. in the long-term. In other words, the juvenile court found

that Father had an ongoing, untreated drug problem, did not prioritize K.S.'s needs, and did not think that he needed help to develop as a caregiver who would appropriately look after K.S.

[29] As Father states, he had some success with services, visits, and establishing a relationship with K.S., and we commend him for the efforts that he made. But throughout this case, Father was only sporadically receptive to addressing K.S.'s needs. When Rojek spoke with Father about being a parent caregiver, Father was responsive when he was alone, but he was not responsive when B.B. was also part of the conversation. In addition, Father's work with his therapist ended after he canceled and missed some sessions, proceeding to ignore the therapist's efforts to get in touch with him. Father also seems unwilling to acknowledge K.S.'s special needs. At the termination hearing, he testified that he thought K.S. was merely shy and quiet, that he did not see that K.S. had triggers until around the time his brother overdosed, and that although he can recognize when K.S.'s moods or behavior changes, he cannot recognize what causes those changes. Father also stated that B.B. "was like a trigger for some reason, I don't know why. But it just made her shut down, made [K.S.] shut down and didn't want to talk or anything." Tr. Vol. II p. 244.

[30] K.S. is a child who needs help. Her foster mother testified that K.S. has a developmental delay and attends a developmental preschool. K.S. suffers from consistent nightmares, has trouble remembering things, and, after her removal from Father's house, was scared to return. K.S. exhibited troubling play in therapy, role playing various situations involving punishment of children and

some physical aggression.  Father has not visited K.S. since October 26, 2016, approximately seven months before the termination hearing.  Overall, despite Father's best intentions and any progress he may have made in his relationship with K.S., he was often either unwilling or unable to work toward developing as a parent caregiver who could recognize, prioritize, and appropriately care for K.S.  The trial court did not err by finding that continuation of the parent-child relationship poses a threat to K.S.

## IV.  Best Interests

Finally, Father argues that the trial court erred by finding that DCS proved by clear and convincing evidence that termination is in the best interests of K.S. He challenges the trial court's conclusion that "Termination of the parent-child relationship is in the best interests of [K.S.]  Termination would allow [her] to be adopted into a stable and permanent home where [her] needs will be safely met."  Appellant's App. Vol. II p. 18.  Father relies on the fact that "the right of parents to raise their children should not be terminated solely because there is a better home available for the children."  *A.A. v. Ind. Dep't of Child Servs.*, 51 N.E.3d 1140, 1151 (Ind. 2016) (citation omitted).

According to Father, he has demonstrated his ability to bond with K.S. and take positive steps toward reunification.  Despite having little to no relationship with K.S. at the outset of this case, Father participated in visits to develop a bond between them.  And though K.S. was mute during their initial visits together, over time, she opened up to Father.  And Father was consistent with

his parenting time and participation in K.S.'s court hearings and made enough progress with K.S. to warrant a temporary trial visit.

[33] Again, we acknowledge Father's efforts, but we must also acknowledge the bad choices he made along the way. Prior to K.S.'s placement with Father, Father prioritized B.B.'s needs over his own child's, allowing B.B. and her children to participate in his visits with K.S. against the advice of K.S.'s therapist. Father seemed unaware of B.B.'s harmful impact on K.S. or how or why B.B. would have such an impact on a child. Once K.S. was placed with Father, Father allowed their living condition to deteriorate such that mold was growing in the living room, trash was piled up in the kitchen, and raw sewage was overflowing from a toilet. And during K.S.'s stay, Father allowed his brother to live in his home, even though his brother was recently released from prison and on house arrest. After his brother overdosed in the home while K.S. was there, Father tried to cope with the situation by using drugs himself so that he could "escape reality." Tr. Vol. II p. 7. Despite these serious shortcomings, Father did not think that he had a substance abuse problem to address, let alone that he needed to take action to address it. Further, he gave up on his individual counseling after only two months, apparently because he thought he did not need therapy. Because he discontinued these sessions, Father was unable to show whether he had learned how to establish stability in his life by creating appropriate boundaries and healthy relationships.

[34] In short, Father did not show good judgment or prioritize his relationship with his own child over other relationships in his life. Given this record, we find that

the trial court did not err by concluding that DCS proved by clear and convincing evidence that termination is in the child's best interests.

[35] The judgment of the trial court is affirmed.

Riley, J., and Brown, J., concur.