## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 27 2018, 6:43 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT R.H. | ATTORNEYS FOR APPELLEE |
|---|---|
| David L. Joley<br>Fort Wayne, Indiana | Curtis T. Hill, Jr.<br>Attorney General of Indiana |
| ATTORNEY FOR APPELLANT K.G. | Katherine A. Cornelius<br>Robert J. Henke<br>Deputy Attorneys General<br>Indianapolis, Indiana |
| Roberta Renbarger<br>Fort Wayne, Indiana | |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Termination of the Parent-Child Relationship of Z.G. (Minor Child) and<br><br>R.H. (Mother) and K.G. (Father),<br><br>*Appellants-Respondents,*<br><br>v.<br><br>Indiana Department of Child Services,<br><br>*Appellee-Petitioner.* | April 27, 2018<br><br>Court of Appeals Case No. 02A03-1710-JT-2358<br><br>Appeal from the Allen Superior Court<br><br>The Honorable Charles F. Pratt, Judge<br><br>The Honorable Sherry A. Hartzler, Magistrate<br><br>Trial Court Cause No. 02D08-1609-JT-227 |

**Mathias, Judge.**

[1] R.H. ("Mother") and K.G. ("Father") appeal the order of the Allen Superior Court terminating their rights to their minor child, Z.G. On appeal, Mother and Father argue that the Indiana Department of Child Services ("DCS") presented insufficient evidence to support the trial court's decision to terminate their parental rights.

[2] We affirm.

## Facts and Procedural History

[3] Z.G. was born to Mother and Father in October 2008. Mother and Father are not married but generally lived together while Z.G. was in their care. Both Mother and Father have been incarcerated for criminal convictions and parole violations, and both have used illegal substances in the past. Father is also mildly mentally handicapped and suffers from anxiety and depression.

[4] In May 2014, DCS received a report that Father was yelling at and beating Z.G. in the front yard of a home Father was helping to repair. During their investigation, DCS observed that Z.G. was dirty, bruised, and had sores on his legs. Z.G. stated that Father caused his injuries. The home where Z.G. was found was not safe, had exposed wiring, and had no working utilities. There was no working bathroom, and a five-gallon bucket contained urine and feces. Father also admitted to using cocaine, which he tested positive for. Z.G. was removed from both parents and placed in foster care.

[5] On June 4, 2014, Mother and Father admitted that Z.G. was a child in need of services ("CHINS"). Mother and Father were ordered to refrain from drug use

and criminal activity, maintain clean, safe, and appropriate housing, and cooperate with caseworkers. Mother and Father were also ordered to undergo mental health assessments and drug and alcohol assessments and follow all resulting recommendations. Both parents were ordered to enroll in homebased services, and Father was ordered to attend parenting classes. The trial court ordered both parents to participate in supervised visitation with Z.G.

[6] Mother was involved in a romantic relationship and lived with a man who both she and Father knew had a prior conviction for attempted rape. Father lived with them, but Mother's boyfriend later insisted that Father move out. Father threatened to kill Mother's boyfriend and obtained a gun to do so but did not carry out his threat.

[7] In August 2015, Mother's boyfriend was arrested on a new rape charge. He was later convicted and sentenced to the Department of Correction. Also, during these proceedings, Mother and Father allowed a convicted sex offender to reside with them for two weeks.

[8] Mother violated her parole five times during these proceedings. And she was incarcerated multiple times for approximately nine months total during these proceedings. She is still on parole through October 2018. Mother tested positive for cocaine in March 2017 and April 2017. Mother was unsuccessfully discharged from her court-ordered substance abuse program.

[9] Mother participated in visitation with Z.G. during the periods of time when she was not incarcerated, and that visitation generally went well. Mother's home is

appropriate. And Mother has maintained employment when she is not incarcerated. But Mother would allow Father to care for Z.G. while she is working if Z.G. was returned to her care.

[10] Father tried to commit suicide in 2015 and threatened to kill himself in December 2016. Father lacks coping skills and often resorts to making threats against others, including the service providers in this case. Father consistently lacked a stable home during these proceedings. Father was incarcerated three times for a total of 20 months for violating his parole during these proceedings. He was released from parole in August 2016. He admitted that he used cocaine in April 2017.

[11] Z.G. suffers from post-traumatic stress disorder (PTSD), anxiety disorders, and attention deficit hyperactivity disorder. Z.G. is likely cognitively delayed, but because of behavior problems, service providers were unable to complete an IQ test or cognitive assessment. Z.G.'s behaviors include aggressive behaviors, extreme tantrums, screaming, crying, use of foul language, and running out of his school building. Z.G. lacked the basic skills of a student entering kindergarten. Z.G.'s behavior improved during the 2016-17 school year but was still concerning. He continued to have tantrums and throw items at adults. Instead of running out of the school building, Z.G. would attempt to hide under furniture or run in the school hallways. Z.G. also started biting. Z.G. exhibited his worst behavior on Tuesdays, the day after his visits with Father. Often, his behavior was so disruptive, Z.G. would have to leave school.

[12] Z.G.'s counselor testified that Z.G. is emotionally reactive, and because of his emotional instability, she is only able to address his behavioral problems in counseling. Z.G.'s counselor observed a PTSD flashback when she asked him about a recent visit with his parents. Z.G. hid under a table while he cried and yelled at the counselor to stop hurting him. Z.G. needs a very stable and structured home environment with consistent expectations, consequences, and rewards. And Z.G.'s parents would need to be educated about Z.G.'s diagnosis and training in parenting a special needs child.

[13] In 2015, Z.G.'s counselor observed family visits between Z.G. and Father and Z.G. and Mother. Father had trouble redirecting Z.G. and keeping him on task. During the visit with Mother, Z.G. started to exhibit behaviors the counselor had not seen before including thumb sucking. Z.G. was also actively non-compliant during the visit. The counselor recommended ending the visits between Z.G. and parents.

[14] Father struggles when he tries to deal with Z.G.'s tantrums and aggressive behaviors. To his credit, Father admitted that he is not able to parent Z.G. on his own. Tr. Vol. II p. 229; Tr. Vol. III, p. 2.

[15] Because Mother and Father did not benefit from and/or complete services, continued to use illegal substances, and were incarcerated multiple times during the CHINS proceedings, on November 29, 2016, the DCS filed a petition to terminate Mother's and Father's parental rights. The court held fact-finding hearings on April 26, May 10 and 17, and June 14, 2017.

[16] The court appointed special advocate ("CASA") and family case manager testified that both Mother's and Father's parental rights should be terminated. The CASA and family case manager believed that Mother's rights should be terminated because Mother continued to use cocaine, had not resolved her drug use problem, did not complete her individual therapy, has been repeatedly incarcerated, lived with and had a romantic relationship with a man convicted of attempted rape, demonstrating poor decision-making skills, and allows Father to move in and out of her home. They recommended that Father's rights should be terminated because he failed to benefit from services, did not have safe and stable housing, continued to use cocaine, struggled with life skills, and invited a sex offender to live with him. Father also told Z.G. that Z.G.'s behavior was the reason he could not return to parents' home.

[17] The trial court issued its order terminating Mother's and Father's parental rights to Z.G. on September 12, 2017. Both parents appealed the order, and our court granted the DCS's motion to consolidate the appeals.

## Termination of Parental Rights

[18] We have often noted that the purpose of terminating parental rights is not to punish parents but instead to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights have a constitutional dimension, the law allows for the termination of such rights when the parents are unable or unwilling to meet their responsibilities as parents. *Id.* Indeed, the parents' interests must be subordinated to the child's interests in determining

the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009).

[19] The termination of parental rights is controlled by Indiana Code section 31-35-2-4(b)(2), which provides that a petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

[20] The burden is on the DCS to prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2; *G.Y.*, 904 N.E.2d at 1261. As Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only one prong of that subsection has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. I.C. § 31-35-2-8(a). If the court does not find that the allegations in the petition are true, it shall dismiss the petition. *Id*. at § 8(b).

[21] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id*. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

[22] Indiana Code section 31-35-2-8(c) now[1] provides that the trial court "*shall* enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" to either terminate a parent-child relationship or to dismiss the termination petition. *See* Ind. Code § 31-35-2-8(c) (emphasis added). When the trial court enters such findings and conclusions of law, we apply a two-tiered standard of review. *A.D.S. v. Indiana Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. We first determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains

---

[1] Indiana Code section 31-35-2-8 was amended in 2012 to add the requirement that the trial court enter findings of fact. *See* Pub. L. No. 128-2012; *see also In re N.G.,* 61 N.E.3d 1263, 1265 (Ind. Ct. App. 2016) (noting 2012 amendment to require findings of fact supporting trial court's decision to either grant or dismiss a petition to terminate parental rights).

no facts to support them either directly or by inference." *Id.* (quoting *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996)). If the evidence and inferences support the trial court's decision, we must affirm. *Id.*

# Discussion and Decision

[23] On appeal, Mother and Father argue that the trial court's conclusion that continuation of the parent-child relationship posed a threat to Z.G.'s well-being is not supported by clear and convincing evidence.[2] In considering their arguments, we note that a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before termination the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). And to evaluate whether continuation of the parent-child relationship poses a threat to the child, a trial court "should consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation" while also judging a parent's fitness to care for his child as of the

---

[2] Because we conclude that DCS proved that there is a reasonable probability that the continuation of the parent-child relationships poses a threat to Z.G.'s well-being, we need not address parents' arguments directed at the removal prong of Indiana Code section 31-35-2-4(b)(2)(B). *See In re A.K.*, 924 N.E.3d at 220 (noting that section 4(b)(2)(B) is written in the disjunctive and that the trial court is required to find that only one prong of subsection (b)(2)(B) has been established). Also, although both parties made a statement in their briefs that termination of their rights was not in Z.G.'s best interests, neither parent presented any argument that termination of his or her parental rights was not in Z.G.'s best interests.

time of the termination proceedings, taking into consideration evidence of changed conditions. *In re A.P.*, 981 N.E.2d 75, 81 (Ind. Ct. App. 2012).

*A. Mother*

Mother argues that after she was released from incarceration she enrolled and participated in services. And "the court should have given great weight to the positive steps Mother has taken to reunify with Z.G., and given her the ample time that protects this constitutionally sacred relationship." Mother's Appellant's Br. at 13.

Mother has a history of use of illegal substances and incarceration. Importantly, she did not complete her court-ordered substance abuse treatment program. Her risk of relapse is high. And she tested positive for cocaine in March and April 2017. Mother was also unsuccessfully discharged from home-based therapy. Mother was given another referral for substance abuse counseling, but Mother frequently canceled those appointments. Mother's visitation with Z.G. went well when it occurred, but Mother missed many visitations due to incarceration or cancellations. Mother also demonstrated poor-decision making by being romantically involved with and residing with a man convicted of attempted rape, who was also convicted of rape during these proceedings. Mother also allowed a man Father met in prison live in her home for two weeks. The man was a registered sex offender. Mother would also allow Father to provide day care for Z.G. if he were returned to her care.

Z.G., who has been in foster care since May 2014, requires a very stable and structured home environment with consistent expectations, consequences, and rewards. Although Mother has an adequate home, throughout these proceedings Mother's criminal behavior and subsequent incarcerations made it impossible for her to provide a stable home. Mother's historical pattern of behavior compels the conclusion that she cannot maintain a stable and structured home environment for Z.G. And Mother has not demonstrated that she is able to ensure that Z.G.'s special needs are met. For all of these reasons, we conclude that clear and convincing evidence supports the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationships poses a threat to Z.G.'s well-being.

## B. Father

Father argues that he has a deep bond with Z.G. and cites to the visitation supervisor's testimony that he was caring, engaged, and affectionate during visitation with Z.G. Father also notes that he is participating in services to assist him with coping skills and maintaining stable housing.

Father participated in services; however, Father did not demonstrate that he benefited from those services. Also, Father's mild mental handicap and mental health issues inhibit his ability to parent a special needs child. Father did not learn to control Z.G.'s behaviors, and his progress in family therapy was slow. Father struggles with coping skills and frustration often results in Father threatening other people.

Father has a history of using illegal substances when he is under stress. Father has demonstrated poor decision making in several instances including obtaining a gun to shoot Mother's boyfriend, allowing a sex offender to live with him for two weeks, and living with individuals who steal from him. Father is unable to protect himself from those who seek to take advantage of him. And Father has not been able to maintain a stable home and struggles to provide for his own needs. Finally, Father admitted that he would not be able to parent Z.G. by himself. For these reasons, we conclude that the DCS presented clear and convincing evidence that continuation of Father's relationship with Z.G. poses a threat to his well-being.

## Conclusion

Nearly all cases involving the termination of parental rights are tragic. This case is no different. We have no reason to doubt Mother's and Father's love for and bond with Z.G. But that does not make the termination of their parental rights improper. Mother's and Father's argument that the DCS failed to prove that continuation of the parent-child relationship poses a threat to Z.G.'s well-being is merely a request to reweigh the evidence and the credibility of the witnesses, which we cannot do. Considering the facts favorable to the trial court's decision, and the reasonable inferences that may be drawn therefrom, we cannot say that the trial court clearly erred in terminating Mother's and Father's parental rights.

Affirmed.

Riley, J., and May, J., concur.