

FILED

Nov 19 2019, 6:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark K. Leeman
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re The Termination of The Parent-Child Relationship of G.F. (Minor Child)<br><br>and<br><br>J.W. (Father)<br><br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner* | November 19, 2019<br><br>Court of Appeals Case No. 19A-JT-1298<br><br>Appeal from the Cass Circuit Court<br><br>The Honorable Stephen Roger Kitts II, Judge<br><br>Trial Court Cause No. 09C01-1812-JT-35 |

**Altice, Judge.**

## Case Summary

[1] J.W. (Father) appeals from the involuntary termination of his parental rights to his daughter, G.F. (Child). He challenges the sufficiency of the evidence supporting the termination order. [1]

[2] We affirm.

## Facts & Procedural History

[3] Child was born to Mother on February 24, 2008, with paternity undetermined. Mother has a lengthy history of criminal behavior and drug abuse both before and after Child's birth. The Indiana Department of Child Services (DCS) became involved with the family in July 2008. Following an unsuccessful period of informal adjustment and erratic behavior by Mother, DCS obtained emergency custody of Child and her sibling at the end of December 2008. Child and her sibling were placed in relative care with their maternal grandmother (Grandmother) and the children were adjudicated CHINS. Mother continued using drugs and did not comply with services offered by DCS or with the terms of her probation in a criminal matter. Accordingly, in

---

[1] G.F.'s mother's rights were also terminated, but H.M. (Mother) does not participate in this appeal.

September 2009, Grandmother established a legal guardianship over Child and her sibling, and the CHINS proceedings were subsequently terminated.

[4] The guardianship lasted for over six years, while Mother continued her pattern of criminal behavior and drug use. In January 2014, Mother's in-home detention was revoked following her use of several illegal substances, and she was sent to prison for the remainder of her sentence, over four years.

[5] After her release from prison back to in-home detention, Mother was doing well and was drug-free, so she and Grandmother agreed to dissolve the guardianship in November 2015. By June 2016, however, Child was again adjudicated a CHINS. In August 2016, Child was removed from Mother's care and placed in foster care, where she has since remained.

[6] Around July 2017, Mother identified Father as Child's potential father, and DCS family case manager (FCM) Kimberly Ross contacted him in Maryland, where he had been living for about a year. Father did not initially complete paternity testing. On September 27, 2017, Father, by his own report, was depressed and attempted suicide in an abandoned house by injecting himself with heroin. Thereafter, he went into rehab for over three months, during which time he took a paternity test that established him as Child's biological father. He moved back to Indiana in January 2018 to be a part of Child's life.

[7] Father had one supervised visit with Child on January 31, 2018. Child, who was almost ten years old at the time, was excited to meet her biological father for the first time. This, however, was her one and only visit with Father

because he turned to methamphetamine and was incarcerated within weeks of the visit.[2]

[8] Father had an extensive criminal history in Indiana prior to his return in January 2018. His prior convictions include: possession of marijuana (2008, followed by revocation of probation on three separate occasions), battery resulting in bodily injury (2007), conversion (2011), theft (2012), attempted theft (2013, with probation revoked twice), conversion (2015), theft (2016), and theft (2016).

[9] Shortly after his return to Indiana, Father continued his criminal lifestyle and use of illegal drugs. On February 16, 2018, Father was arrested and charged with unlawful possession of a syringe, possession of marijuana, and possession of paraphernalia. Father remained in jail until May 3, 2018, when he entered into a plea agreement, pled guilty to possession of marijuana, and received a sentence of time served.

[10] Father was arrested again within a few weeks and charged, on May 30, 2018, with possession of methamphetamine under cause number 34D04-1805-F6-124 (Cause F6-124). He posted bond the following day but then failed to appear for his initial hearing on June 8, 2018, and a warrant for his arrest was issued.

---

[2] FCM Ross met with Father on the day of the visit and discussed the case plan and available services. Father was incarcerated at the time of his initial CHINS hearing in April 2018, as well as the dispositional hearing on May 30, 2018.

On August 11, 2018, Father was arrested following a dangerous police chase, where Father disregarded stop signs and drove at a high rate of speed before crashing into two parked vehicles and then fleeing on foot. He was charged, on August 20, 2018, with unlawful possession of a syringe, resisting law enforcement, and possession of methamphetamine under cause number 34D02-1808-F6-862 (Cause F6-862).

Father was released on bond on September 7, 2018, but he then failed to make any contact with the probation department or otherwise comply with the conditions of bond and failed to appear at a pretrial hearing. As a result, a warrant was issued under both pending causes for Father's arrest on October 12, 2018. He was arrested about a week later and then released on his own recognizance on October 26, 2018.

Shortly thereafter, on November 20, 2018, Father was arrested and subsequently charged, under cause number 34D02-1811-F5-1779 (Cause F5-1779), with possession of methamphetamine, resisting law enforcement, and possession of paraphernalia. Father remained in jail until he was released on his own recognizance on January 29, 2019, with the following specific conditions: 1) Father was to report to and comply with probation upon his release; 2) he was required to enroll in the Clean Slate Program or other program recommended by probation; and 3) Father was to comply with DCS regarding Child. Father did none of these, making absolutely no contact with probation or DCS upon his release. Accordingly, a warrant was issued for his arrest on February 21, 2019, and served on February 27, 2019.

[14] In the meantime, Father had been arrested for, among other things, possession of methamphetamine on February 16, 2019. He was charged with four counts under cause number 34D02-1902-F6-537 (Cause F6-537). Bond was set "in the sum of $9,000, NO 10%, NO BONDSMAN." *Exhibits Vol. 3* at 194. Father remained incarcerated pending trial and, on March 8, 2019, the Howard County Problem Solving Court Screening Team recommended that he be denied entry into drug court.

[15] As a result of Father's ongoing drug use and repeated incarcerations, he made no progress toward reunification with Child and had no contact with her after the initial visit. Even when not incarcerated, Father failed to maintain contact with DCS. Father and Mother followed similar paths, making the parenting of Child by either of them untenable.

[16] On December 10, 2018, DCS filed the instant petition for the involuntary termination of the parent-child relationship between Child and Father (as well as Mother). On April 16, 2019, the trial court held an evidentiary hearing on the petition. At the time of the hearing, Father remained in jail under Cause F6-537, with three other pending felony cases (Causes F6-124, F6-862, and F5-1779).[3] Father testified that he became addicted to methamphetamine after moving back to Indiana and that he hoped to get his pending criminal cases

---

[3] Mother had an active arrest warrant pending and did not appear for the evidentiary hearing.

straightened out within a couple months so that he could begin the process of drug rehabilitation and engaging in DCS services.

[17] Christine Nelson, Child's therapist since March 2017, testified that she works with Child biweekly and that Child has been diagnosed with ADHD and PTSD. Nelson explained that Child has an inability to recognize and express emotions, especially with adults. Child suffers from anxiety and feelings of being overwhelmed. Nelson never included Mother or Father in therapy because she did not believe they were able to provide the emotional stability Child needed.

[18] FCM Ross testified that despite being offered services upon his return to Indiana, Father did not complete any of them and did not contact DCS even when not incarcerated. FCM Ross opined that allowing Father's relationship with Child to continue would be a threat to Child and would not be in Child's best interests. Child had been in the same foster home for nearly three years, and the foster parents wish to adopt her. FCM Ross testified that adoption would be in Child's best interests. Similarly, the GAL opined that termination of parental rights was in Child's best interests, noting that Child has had a particularly "tough life" and that instead of seizing on the opportunity to get to know Child, Father became depressed and turned to drugs. *Transcript* at 62.

[19] At the conclusion of the evidentiary hearing, the trial court observed that Father's hope for drug court was fleeting, as there had been a recent recommendation in several of his criminal cases that he be denied entry. Thus,

the court found no reason to suspect that Father would be in any position to participate in DCS services "in any meaningful way in the immediate future." *Id*. at 65. The court continued, "I believe what we have here, is a child in distress, who requires the certainty of closure in order to establish the stability she needs for her care and treatment." *Id*. The court granted the termination petition and indicated a written opinion would follow.

[20] On May 9, 2019, the trial court issued its termination order, along with extensive findings of fact and conclusions. In addition to laying out the facts set out above, the order provided in part:

> 49. Through the efforts of [DCS] in the CHINS proceeding, Father was advised of his child's existence and given the opportunity to meet and possibly be a permanency option for his child. Despite being given that chance, Father has either suffered multiple relapses or never obtained sobriety for any period of time outside of the periods in which he was incarcerated.

> 50. Father's own testimony was that he has an addiction to methamphetamine which he has struggled with since his move to Indiana a year ago. In addition to the reports of required substance abuse treatment during previous criminal cases in Indiana, Father reports completing a rehabilitation stay in Maryland after attempting suicide by heroin overdose in the months prior to his move to Indiana in 2018.

> 51. Acknowledging the valid point that Father was essentially robbed of nearly a decade of chances to get to know his child, Father has been given the opportunity to do just that for the last year. When given the opportunity, Father has reverted to the

same criminal-type behavior that he was involved in during his previous time in Indiana.

52. As of the date of the hearing, this child has resided in the care of a parent for only a short period of her eleven years of life. Child lived with Mother for the first ten months of her life and during that time, also lived with [Grandmother]. From the age of ten months until age seven, Child lived with [Grandmother] under a legal guardianship. At the termination of the guardianship, Child only lived with [Mother] for a period of ten months before being removed and placed into a foster home …. When Child was in Mother's care, there is evidence of Mother's continued, seemingly uncontrollable use of illegal substances. There is no indication that, if given more time, Father would be able to offer any more stability than Mother. In the year that has been given to Father, he has been unable to be present in her life due to Father's own choices and conduct.

53. Father essentially requests that this court forget the last year and give him more time to get to know his child and turn his life around. However, love and affection do little to take care of a child when a parent is consistently conducting criminal acts and choosing to use illegal substances. Despite any professed love for this child, Father has failed to choose conduct that would aid in reunification or enhance his ability to care for his child.

54. Outside of periods of incarceration, neither parent has showed an ability or willingness to maintain sobriety. The mere possibility that either parent will put forth the effort to obtain and maintain sobriety is so infinitesimal as to lead this court to find it will be unlikely that either parent will remedy their substance abuse issues, or to place themselves in a position where they can provide for their young child. This is especially true of Mother who is currently evading arrest.

*Appellant's Appendix Vol. II* at 72-73. Thus, the trial court concluded that there was a reasonable probability that continuation of the parent-child relationship posed a threat to Child's well-being.

[21] The trial court also made several findings in support of its conclusion that termination was in Child's best interests. Among other things, the court observed that Child "is in need of stability and permanency given her history of instability and neglect" and that her parents "cannot and are unlikely to ever be able to provide either of these things." *Id.* at 73. The trial court continued:

> 6. Through their own actions, the parents have shown this court that when given the opportunity to treat their substance abuse and develop or maintain a bond with their child, they are unwilling to make a meaningful, consistent effort.
>
> 7. The actions of the parents have only demonstrated an inability to parent this child or to provide her with a nurturing, stable and appropriate environment ….
>
> 8. Just in the last twelve months the parents have made minimal efforts toward reunification …. It is not in the child's best interest to allow this pattern of behavior to continue. Further efforts to reunite … are more than unlikely to succeed.
>
> 9. It is time for this child to have permanency and not perpetual foster care and uncertainty in her life.
>
> 10. Permanency alone does not lend the court to find that termination is in the child's best interest. The evidence in this case is that there is more than a need for permanency and in part it is the need for stability and consistency in caregivers given her

history of trauma that requires this court to terminate the
parental rights of the parents.

*Id*. at 74. After making other statutorily required conclusions, the trial court's
order provided for the termination of parental rights. Father now appeals.
Additional information will be provided below as needed.

### Discussion & Decision

[22] When reviewing the termination of parental rights, we will not reweigh the
evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628
(Ind. 2016). Instead, we consider only the evidence and reasonable inferences
most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App.
2004), *trans. denied*. In deference to the trial court's unique position to assess
the evidence, we will set aside its judgment terminating a parent-child
relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind.
Ct. App. 1999), *trans. denied*. In light of the applicable clear and convincing
evidence standard, we review to determine whether the evidence clearly and
convincingly supports the findings and whether the findings clearly and
convincingly support the judgment. *In re R.S.*, 56 N.E.3d at 628.

[23] We recognize that the traditional right of parents to "establish a home and raise
their children is protected by the Fourteenth Amendment of the United States
Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*.
Although parental rights are of constitutional dimension, the law provides for
the termination of these rights when parents are unable or unwilling to meet

their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[24] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things, that one of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B); Ind. Code § 31-37-14-2. In this case, the trial court found that subsection (ii) had been proven by clear and convincing evidence.

[25] On appeal, Father argues only that the trial court's findings did not establish that continuation of the parent-child relationship would pose a threat to Child's

well-being.[4] His argument is based solely on the premise that there were no findings indicating that he "posed a menace to do bodily harm" to Child. *Appellant's Brief* at 17. No such findings, however, were required to establish a threat to Child's well-being. *See In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) ("Although there was no specific testimony that either parent had physically abused A.I., there can be little doubt that the parties' serious substance abuse addictions detrimentally affected or greatly endangered her."), *trans. denied*.

[26] It is well established that "a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). The trial court observed in this case the particularly traumatic life Child has endured due to Mother's instability and neglect. Child suffers from PTSD (as well as ADHD) and requires substantial and ongoing therapy to deal with the effects of her past. At the time of the termination hearing, Child was eleven years old and had only lived with Mother for two ten-month stints of her life, periods that were ravaged by illegal drug use and lack of safe parenting.

[27] As the trial court recognized, Father was robbed of the chance to develop a relationship with Child during her first almost ten years of life. When given a

---

[4] The trial court made findings and conclusions regarding other statutorily required termination factors, which Father does not challenge on appeal.

chance to be a father to Child, a parent that she desperately needed, Father failed her. After a suicide attempt by overdosing on heroin in Maryland, followed by rehab, he returned to Indiana and quickly turned to abusing methamphetamine and criminal behavior, resulting in him being unavailable to visit Child, let alone parent her in any stable manner. *See K.T.K. v. Indiana Dep't of Child Servs.*, 989 N.E.2d 1225, 1235-36 (Ind. 2013) ("Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children."). In the fifteen months that he was in Indiana leading up to the termination hearing, Father was charged with felonies in five separate causes – the most recent being two months before the hearing – and four remained pending at the time of the termination hearing. During those fifteen months, Father spent the vast majority of the time in jail, and even when out of jail, he often had active arrest warrants for violations of bond. He visited Child only once and did not stay in contact with DCS or participate in services when out of jail.

[28] Father's habitual pattern of conduct is highly relevant in determining whether the continuation of the parent-child relationship poses a threat to Child, as it suggests a substantial probability of future neglect or deprivation. *See In re A.P.*, 981 N.E.2d 75, 81 (Ind. Ct. App. 2012). Like Mother, Father has a long history of criminal behavior and drug addiction, a pattern that he was unable to break even after learning that he was Child's father and after being offered targeted services through DCS, as well as probation. At the time of the termination hearing, Father remained unfit to care for Child and had made none of the

needed changes in his life to provide the stability that Child so desperately needed. *See id.* ("trial court should judge a parent's fitness to care for her child as of the time of the termination proceedings, taking into consideration evidence of changed conditions").

[29] DCS presented ample evidence to establish that Father engaged in destructive and dangerous behavior due to his drug abuse and criminal propensity, that the behavior was ongoing without any serious sign of improvement, and that the behavior posed a threat to Child. *See In re A.I.*, 825 N.E.2d at 807. Accordingly, the trial court could readily conclude that there was a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of Child.

[30] Father correctly observes that "[i]t is the inadequacy of parental custody and not the superiority of an available alternative that determines whether parental rights should be terminated." *In re V.A.*, 632 N.E.2d 752, 756 (Ind. Ct. App. 1994). His behavior during the fifteen months leading up to the termination hearing established that he was not a safe or available option for Child and that his parental rights should be terminated.

[31] Judgment affirmed.

Brown, J. and Tavitas, J., concur.